No. 19-11327

_____

**In the United States Court of Appeals**
**for the Fifth Circuit**
_____

Diane Scott Haddock,
*Plaintiff – Appellant,*

v.

Tarrant County, Texas, Patricia Baca-Bennett, Kenneth Earl Newell,
Jesus Nevarez, Jr., Honorable Judith Wells, Jerome S. Hennigan,
James B. Munford; Alex Kim,
*Defendants – Appellees.*

_____

On Appeal from the United States District Court
for the Northern District of Texas, Fort Worth Division
Honorable Judge Reed O'Connor Presiding

_____

# BRIEF OF APPELLANT
_____

**WALTER L. TAYLOR**
State Bar No. 19727030
**HART LAW FIRM, PLLC**
6630 Colleyville Boulevard, Suite 100
Colleyville, Texas 76034
Tel: (817) 329-7020
Fax : (682) 292-7406
*WTaylor@thehartlawfirm.com*
**ATTORNEYS FOR APPELLANT**
**DIANE SCOTT HADDOCK**

# ORAL ARGUMENT REQUESTED

<u>**CERTIFICATE OF INTERESTED PERSONS**</u>

Appellant certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

1) <u>**Plaintiff – Appellant:**</u>
   Diane Scott Haddock

2) <u>**Defendants – Appellees:**</u>
   Tarrant County, Texas, Patricia Baca-Bennett, Kenneth Earl Newell, Jesus "Jesse" Nevarez, Jr., Judith Wells, Jerome S. Hennigan, James B. Munford, and Alex Kim

3) <u>**Counsel for Plaintiff – Appellant:**</u>
   Walter L. Taylor / Hart Law Firm, PLLC

4) <u>**Counsel for Defendant – Appellee Tarrant County, Texas:**</u>
   Sharen Wilson; M. Keith Ogle; David K. Hudson
   Tarrant County Criminal District Attorney's Office (Civil Division)

5) <u>**Counsel for Defendants – Appellees Patricia Baca-Bennett, Kenneth Earl Newell, Jesus "Jesse" Nevarez, Jr., Judith Wells, Jerome S. Hennigan, James B. Munford, and Alex Kim:**</u>
   Ken Paxton; Jeffrey C. Mateer; Darren L. McCarty; Thomas A. Albright; Brantley Starr; James E. Davis; David A. Talbot, Jr.; Amanda J. Cochran-McCall; Benjamin S. Walton; Natalie D. Thompson
   Office of the Attorney General of Texas

*/s/ Walter L. Taylor*
**WALTER L. TAYLOR**
**Attorney of record for Appellant**
**Diane Scott Haddock**

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to **Fed. R. App. P. 34(a)(2)(C),** Appellant Diane Scott Haddock respectfully requests oral argument. The issues in this case are complex, and Appellant believes oral argument will significantly aid the Court's decisional process.

# TABLE OF CONTENTS

**CERTIFICATE OF INTERESTED PERSONS**.....................................................ii

**STATEMENT REGARDING ORAL ARGUMENT**.........................................iii

**TABLE OF CONTENTS** ...................................................................................iv

**TABLE OF AUTHORITIES** ...........................................................................vii

**JURISDICTIONAL STATEMENT**.....................................................................1

**ISSUES PRESENTED**..........................................................................................1

**STATEMENT OF THE CASE**............................................................................2

**STANDARD OF REVIEW** .................................................................................10

**SUMMARY OF THE ARGUMENT** ..................................................................11

**ARGUMENT AND AUTHORITIES**...................................................................17

*I.(A) Did the district court err when it dismissed Diane's freedom of association/intimate relations claim – that as a public employee, Diane could not be retaliated against for her husband Gerald's public speech on a matter of public concern – without recognizing and addressing it as a separate and distinct violation of the First Amendment?* ....................................................18

    1) Marriage is Our Society's Oldest and Most Sacred Relationship:..............20

    2) Other Circuits Uphold First Amendment Strict Scrutiny Protection of the Intimate Marriage Relationship and Either Reject the *Pickering/Connick* Balancing Test or Apply It in Favor of the Marriage Interest:..........................20

    3) Even if *Pickering/Connick* Does Apply, It Heavily Favors Diane; Modern Society Recognizes Judges and Their Spouses are Different People: ..............26

*I.(B) Did the district court err when it dismissed Diane's freedom of petition claim – never challenged by any 12(b)(6) Motion or discussed in the district court's Order –without analyzing it as a separate cause of action and considering whether Diane, in filing her lawsuit, spoke as a citizen on a matter of public concern?* ..29

    1) The First Amendment Protects Lawsuits Against Government Employers, Because Such Lawsuits Develop Important Legal Rights and Serve the Public Interest: .........................................................................................................29

    2) Diane's Lawsuit Involved Matters of Public Concern and Public Interest:31

3) The Strict Scrutiny-Based *Pickering/Connick* Balancing Test Heavily Favors Protection of Diane's Right to Petition: ................................................35

*I.(C) Assuming the district court could ignore Diane's "pure association" claim and allow her to be punished for Gerald's conduct, did the district court err when it dismissed Diane's free speech claim by applying an Elrod/Branti analysis to Diane's job, rather than applying a Pickering/Connick balancing test to the speech?* ................................................................................................................35

1) Free Speech Protects Both the Speaker's Right to Speak and the Public's Right to Hear: ................................................................................................36

2) The First Amendment Has Its Fullest and Most Urgent Application to Election/Issue Speech: ........................................................................................37

3) Courts Achieve Strict Scrutiny of Speech Restrictions By Applying the *Pickering/Connick* Balancing Test: ..................................................................39

4) The *Pickering/Connick* Balancing Test Heavily Favors the Election/Issue Speech Involved in This Case, Diane's Marriage, and Her Lawsuit: ...............42

*I.(D) Even if an Elrod/Branti analysis applied to Diane's political patronage claim, did the district court err in holding associate judges are "confidential employees" and "policymakers," and that both the associate judges and their spouses are subject to a political loyalty requirement, in conflict with recent Third Circuit authority? Is that the same thing as "compelled speech," which the Supreme Court recently said the First Amendment prohibits?* ...........................47

1) In Political Patronage Cases Courts Exact Strict Scrutiny Using the *Elrod/Branti* Balancing Test: ............................................................................47

2) The *Elrod/Branti* Balancing Test Favors Diane, Because Forced Patronage is the Same as "Compelled Speech, Because Close Confidences Do Not Arise in Forty-Nine (49) Working Relationships, and Because There Are No "Policies": ............................................................................................................49

3) The Third Circuit Recently Held Judges Do Not Make Policy; Judges Independently Apply Law to Fact: ..................................................................51

*II. Given Tarrant County's refusal to enforce its own written policies, its conscious indifference to and the participation of its policymakers in the violation of Diane's First Amendment rights, did the district court err when it dismissed Tarrant County on a Rule 12(b)(6) Motion?* ....................................................................54

1) Municipal Liability Requires Either Custom/Policy or Single Action By a Policymaker: ................................................................................55

2) Tarrant County Established a System in Which Its Delegation of Authority Over Tarrant County Employers Makes the District Judges County Policymakers: ................................................................................56

3) Tarrant County Violated Its Own Written Policy Protecting Employees From Political Coercion: ................................................................58

*III. Did the district court err in holding Defendant Baca-Bennett had qualified immunity, even though the parameters of Diane's First Amendment rights had been clearly established (some longer than 35 years), and despite the fact that Baca-Bennett is an elected judge who swore to uphold the U.S. Constitution and the laws of the United States?* ................................................................61

1) Actions for Damages Against Public Officials Are Necessary to Curtail Abuse of Power That Violates Established Rights: ..........................61

2) Precedent With Fundamentally Similar Fact Scenarios Is Not Required to Defeat Qualified Immunity: ..........................................................62

3) Diane's Rights Were "Clearly Established" Decades Ago: ........................63

4) It is "Too Late in the Day" For Baca-Bennett to Deny Having Fair Warning of the Law: ..........................................................................64

**CONCLUSION AND PRAYER** ........................................................................**65**

**CERTIFICATE OF COMPLIANCE** ................................................................**66**

# TABLE OF AUTHORITIES

**Cases**

*Adams v. Governor of Delaware*, <u>922 F.3d 166, 181</u> (3rd Cir.) (*cert. granted* <u>140 S.Ct. 602</u> (2019)) ................................................................ 52, 53

*Adkins v. Board of Educ. of Magoffin County, Ky.*, <u>982 F.2d 952</u> (6th Cir. 1993) ................................................................................ 22, 63

*Adler v. Pataki*, <u>185 F.3d 35</u> (2nd Cir. 1999) .............................. 20, 21, 22

*Anderson v. Creighton*, <u>483 U.S. 635, 638</u> (1987). .......................... 61, 62

*Application of Gaulkin*, <u>351 A.2</u>d. 740, 743 (New Jersey 1976) ........... 26, 27

*Ashcroft v. Iqbal*, <u>556 U.S. 662, 678</u> (2009) ..................................... 10

*Bd. of Cty. Comm'rs of Bryan Cty., Olka. v. Brown*, <u>520 U.S. 397, 405</u> (1997)....56

*Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, <u>481 U.S. 537, 545</u> (1987)<u>19</u>, 35

*Bedingfield ex rel. Bedingfield v. Deen*, <u>487 Fed.Appx. 219, 231</u> (5th Cir. 2012). ....................................................................................62

*Bell Atl. Corp. v. Twombly*, <u>550 U.S. 544, 570</u> (2007) .................... 10, 11

*Borough of Duryea v. Guarnieri*, <u>564 U.S. 379</u> (2011 ............. 29, 30, 31, 46

*Bosque v. Starr Cty.*, <u>630 Fed. App'x 300, 305</u> (5th Cir. 2015) ...........29

*Bouldin v. Troy*, <u>2016 WL 11674943</u> (M.D. Ala. 2016) ........................24

*Brady v. Houston Indep. Sch. Dist.*, <u>113 F.3d 1419, 1424</u> (5th Cir. 1997) ..........29

*Branti v. Finkel*, <u>445 U.S. 507</u> (1980) ....................................passim

*Buckley v. Valeo*, <u>424 U.S. 1</u> (1976) ...................................... 37, 48

*Burlington, N. & SFR Co. v. White*, <u>548 U.S. 53</u> (2006). ....................32

*Caleb v. Grier*, <u>598 Fed.Appx. 227, 237</u> (5th Cir. 2015)......................19

*Cicalese v. UTMB*, <u>924 F.3d 762, 765-66</u> (5th Cir. 2019) ............... 10, 11

*Citizens United* v. Federal Election Com'n, <u>558 U.S. 310, 336</u> (2010). ......passim

*Connick v. Myers*, <u>461 U.S. 138</u> (1983)...................................passim

*Cooper v. Brown*, <u>844 F.3d 517, 524</u> (5th Cir. 2016). ..........................62

*Cox v. Kaelin*, <u>577 Fed.Appx. 306, 310</u> (5th Cir. 2014). .....................11

*CSC v. Letter Carriers*, <u>413 U.S. 548</u> (1973)................................41

*D'Angelo v. Sch. Bd. of Polk Cty., Fla.*, <u>497 F.3d 1203, 1212</u> (11th Cir. 2007)..23

*Davis v. McKinney*, <u>518 F.3d 304, 313</u> (5th Cir. 2008) ........................33

*Elrod v. Burns*, <u>427 U.S. 347</u> (1976) ....................................passim

*Eu v. San Francisco County Democratic Central Comm.*, <u>489 U.S. 214, 223</u> (1989).......................................................................38

*Federal Election Com'n v.* WRTL, <u>551 U.S. 449, 464</u> (2007) ...............................38

*First Nat. Bank of Boston v. Bellotti*, <u>435 U.S. 765, 784</u> (1978)............................38

*Garcetti v. Ceballos*, <u>547 U.S. 410</u> (2006), at 419 ....................................................32

*Gee v Principi*, <u>289 F.3d 342, 346-347</u> (5th Cir.2002)................................ 8, 18, 29

*Gibson v. Kilpatrick*, <u>838 F.3d 476</u> (5th Cir. 2016) ............................................ 32, 33

*Gray v. Bruneau-Grand View School District No. 365*, <u>2007 WL 1381785</u> (D. Idaho 2007). ............................................................................................... 24, 25

*Griswold v. Connecticut*, <u>381 U.S. 479, 486</u> (1965) ................................ 20, 27, 46

*Hatcher v. Board of Public Educ. and Orphanage for Bibb County*, <u>809 F.2d 1546, 1557-58</u> (11th Cir. 1987) ........................................................................23

*Hitt v. Connell*, <u>301 F.3d 240</u> (5th Cir.) .........................................................................19

*Hope v. Pelzer*, <u>536 U.S. 730, 741</u> (2002) .....................................................................62

*Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Ga., Inc.*, <u>892 F.3d 719, 726</u> (5th Cir. 2018) ...................................................................10

*James v. Tex Collin Cty.*, <u>535 F.3d 365, 373</u> (5th Cir. 2008) ...............................55

*Janus v. American Federation of State, County, and Municipal Employees, Council 31, et al.*, --- U.S.----, <u>138 S.Ct. 2448, 2463</u> (2018) ........................50

*Kleindienst v. Mandel*, <u>408 U.S. 753, 762-763</u> (1972) .............................................36

*Lane v. Franks*, <u>573 U.S. 228</u> (2014). .................................................................. 32, 33

*Lawrence v. Texas*, <u>539 U.S. 558</u> (2003) ......................................................................26

*Lormand v. U.S. Unwired, Inc.*, <u>565 F.3d 228, 232</u> (5th Cir. 2009).....................11

*McCabe v. Sherrett*, <u>12 F.3d 1558, 1562</u> (11th Cir. 1994) ........................................25

*McCloud v. Testa*, <u>97 F.3d 1536, 1556</u> (6th Cir. 1996) .................................... 64, 65

*McConnell v. Federal Election Com'n*, <u>540 U.S. 93</u> (2003) ...................................37

*Mizell v. North Broward Hospital Dist.*, <u>427 F.2d 468, 472</u>–73 (5th Cir.1970)...56

*Monell v. Dep't of Soc. Servs. of City of N.Y.*, <u>436 U.S. 658, 690</u> (1978). 32, 55, 56

*Montgomery v. Carr*, <u>101 F.3d 1117</u> (6th Cir. 1996) ...................................................25

*Mooney v. Lafayette County School Dist.*, <u>528 Fed.App'x. 447, 456-57</u> (5th Cir. 2013) ....................................................................................................................29

*N.L.R.B. v. Advertisers Mfg. Co.*, <u>823 F.2d 1086, 1088</u> (7th Cir. 1987). .............18

*NAACP v. Alabama*, <u>357 U.S. 449, 460</u>–61, <u>78 S.Ct. 1163, 1171</u>, <u>2 L.Ed.2d 1488</u> (1958) ....................................................................................................................23

*Nesmith v. Alford*, <u>318 F.2d 110, 126</u> (5th Cir. 1963), cert. denied, <u>375 U.S. 975</u> (1964) ....................................................................................................................56

*Obergefell v. Hodges*, --- U.S.---, <u>135 S.Ct. 2584</u> (2015)........................................26

*Owens v. Board of Regents of Texas Southern University*, <u>953 F.Supp. 781, 791</u> (S.D.Tex.1996)......................................................................................................56

*Parks v. City of Warner Robins, Ga.*, 43 F.3d 609, 614-616 (11th Cir. 1995) ...... 25

*Perry v. Sinderman*, 408 U.S. 593 (1972) ................................................................. 49

*Pickering v. Board of Ed.*, 391 U.S. 563 (1968) ............................................... passim

*Procunier v. Martinez*, 416 U.S. 396, 408-409 (1974) ............................................. 36

*Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 390 (1969) .............................. 36

*Roberts v. United States Jaycees*, 468 U.S. 609, 617 (1984) .................... 19, 20, 35

*Ross v. Clayton County*, 173 F.3d 1305, 1310–11 (11th Cir.1999) ....................... 25

*Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990) ....................... 45, 52, 64

*Shahar v. Bowers*, 114 F.3d 1097, 1105-06 (11th Cir. 1995) ........................ 25, 26

*Sherbert v. Verner*, 374 U.S. 398 (1963). .............................................................. 64

*Singleton v. Cecil*, 133 F.3d 631, 635 (8th Cir.1998) ............................................ 25

*Snyder v. Phelps*, 562 U.S. 443, 453 (2011) .......................................................... 33

*Speiser v. Randall*, 357 U.S. 513 (1958) ................................................................ 49

*Staub v. Proctor Hospital*, 562 U.S. 411 (2011) ............................................ 8, 18, 29

*Sutton v. Village of Valley Stream, N.Y.*, 96 F.Supp.2d 189, 193 (E.D.N.Y. 2000) ..................................................................................................................... 22, 44

*Tucker v. Georgia DPS*, 2009 WL 2135807 (S. D. Ga. 2009), p. 12 . 24, 28, 45, 63

*United States v. Lanier*, 520 U.S. 259, 270 (1997) ................................................ 62

*United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 813 (2000) . 38

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976) ................................................................................................... 36

*Wallace v. Texas Tech*, 80 F3d. 1042, 1051 (5th Cir. 1996) .................................. 19

**Statutes**

28 U.S.C. §§ 1291 .......................................................................................................1

28 U.S.C. §§ 1331 .......................................................................................................1

42 U.S.C. § 1983 .............................................................................................. 1, 6, 55

**Other Authorities**

2012 Census of Governments: Employment Census Report .............................. 17

5 WRIGHT & MILLER, FED. PRAC. & PROC.§ 1216, 235–36 (3d ed. 2004) ..................................................................................................................... 11

Fifth Circuit Pattern Jury Instructions (Civil Case), §11.7 (2014) ........ 8, 18, 29

Illinois Advisory Opinion 06-2, Illinois Judges' Association 2006 ................... 27

Key Issues in Judicial Ethics: Political Activity by Members of a Judge's Family, American Judicature Society 1996, by Cynthia Gray, Director, Center for Judicial Ethics, p. 1 .............................................................................. 27

**Texas Code of Judicial Conduct, Canon 2B** ................................................**51**

**Texas Code of Judicial Conduct, Canon 4** ................................................**28**

**Texas Code of Judicial Conduct, Canon 5** ............................................ **28, 51**

**Texas Judicial Ethics Opinion 170** ......................................................**51**

**Rules**

**Fed. R. App. P. 34(a)(2)(C)** ................................................................ **iii**

**Federal Rule of Civil Procedure 12(b)(6))** ..................................... **1, 10**

**Federal Rule of Civil Procedure 8(a)(2)** ........................................**11**

**FRAP 4(1)(A)** ................................................................................**1**

## JURISDICTIONAL STATEMENT

Appellant/Plaintiff Diane Scott Haddock ("Diane")[1] – a public employee – filed this case under **42 U.S.C. §1983**, asserting her government employers violated her First Amendment rights. The district court's jurisdiction arose under **28 U.S.C. §1331** (federal question) and **§1343** (deprivation of United States citizen's constitutional right).

This Court's jurisdiction arises under **28 U.S.C. §1291** (appeal from a final decision of district court of the United States – granting motions to dismiss under **Federal Rule of Civil Procedure 12(b)(6)**).

Appellant/Plaintiff timely perfected this appeal by filing her Notice of Appeal on December 10, 2019 [ROA.984-5, RE Tab 2], within thirty (30) days of the district clerk's November 12, 2019, entry of a Final Judgment disposing of all parties' claims. ROA.983, RE Tab 3.[2] **FRAP 4(1)(A).**

## ISSUES PRESENTED

*I.(A) Did the district court err when it dismissed Diane's freedom of association/intimate relations claim – that as a public employee, Diane could not be retaliated against for her husband Gerald's public speech on a matter of public concern – without recognizing and addressing it as a separate and distinct violation of the First Amendment?*

---

[1] Plaintiff's husband, Gerald, is featured prominently in the facts underlying this appeal. Since they share the last name "Haddock," Appellant refers to them both by first name to ensure clarity and minimize confusion.

[2] The Order and Final Judgment were signed November 11, 2019, and entered on November 12, 2019 (November 11, 2019, was Veteran's Day – a federal holiday).

*I.(B) Did the district court err when it dismissed Diane's freedom of petition claim – never challenged by any 12(b)(6) Motion or discussed in the district court's Order –without analyzing it as a separate cause of action and considering whether Diane, in filing her lawsuit, spoke as a citizen on a matter of public concern?*

*I.(C) Assuming the district court could ignore Diane's "pure association" claim and allow her to be punished for Gerald's conduct, did the district court err when it dismissed Diane's free speech claim by applying an <u>Elrod/Branti</u> analysis to Diane's job, rather than applying a <u>Pickering/Connick</u> balancing test to the speech?*

*I.(D) Even applying an <u>Elrod/Branti</u> analysis to Diane's political patronage claim, did the district court err in holding associate judges are "confidential employees" and "policymakers," rendering both the associate judges <u>and their spouses</u> subject to a political loyalty requirement, in conflict with recent Third Circuit authority? Is that the same thing as "compelled speech," which the Supreme Court has recently said the First Amendment prohibits?*

*II. Given Tarrant County's refusal to enforce its own written policies, its conscious indifference to and the participation of its policymakers in the violation of Diane's First Amendment rights, did the district court err when it dismissed Tarrant County on a Rule 12(b)(6) Motion?*

*III. Did the district court err in holding Defendant Baca-Bennett had qualified immunity, even though the parameters of Diane's First Amendment rights had been clearly established (some longer than 35 years), and despite the fact that Baca-Bennett is an elected judge who swore to uphold the U.S. Constitution and the laws of the United States?*

## <u>STATEMENT OF THE CASE</u>

This is a First Amendment retaliation case. Diane – a 20-year associate judge in Tarrant County's family courts – was eminently qualified for her job. <u>ROA.643</u>. Certified in judicial studies, with 30 years' experience in family law, Diane presided over 45,000+ family law matters. <u>ROA.643</u>. Diane is one of seven association judges, and each associate serves all seven family district judges. <u>ROA.671-74</u>. One

district judge called Diane "the best AJ in the State." ROA.643, 689-90. Diane had dreamed of being a judge since the age of 7 and planned to continue until retirement. ROA.644, 661.

In 2017, both Diane and fellow family Associate Judge Jim Munford were running for judge. ROA.645. It was initially unknown whether they would be opponents for the same bench. ROA.645. Diane ultimately decided not to run. ROA.649. Before Diane got out of the election, Munford's wife made a public, false and outrageous allegation that Diane had "taken a bribe" in a previous case. ROA.645-46. Although Munford and his wife vowed to retract, neither did. ROA.646.

In 2017 and early 2018, new District Judge Baca-Bennett publicly supported Munford's election bid. ROA.651. Baca-Bennett became angry over public statements about Munford's history and qualifications, which she attributed to Diane's husband Gerald,[3] including:

1) Munford was a "RINO" (Republican in name only). (ROA.646 [including n.9]);

2) Munford's wife had falsely and publicly accused Diane of taking a bribe (ROA.648 [including n.12]);

3) Munford was violating Second Amendment rights by signing orders seizing or requiring surrender of guns without evidence of violence or danger (ROA.649);

---

[3] ROA.651.

4) Munford's first wife accused Munford of abuse and sexual assault and now spoke publicly on domestic abuse (ROA.649 [including n.13]); and

5) Munford's current wife (Terry) was terrified of him (ROA.649 [including n.14]); and

6) Munford had caught Terry in a car with a male friend and approached them with a gun; that the friend ran over Munford's foot and broke it (contrary to Munford's claim he had run over his own foot. ROA.649 [including n.14].

For several months in 2018, Baca-Bennett used her supervisory authority (as a district judge) over Diane to retaliate and create a hostile work environment. ROA.639, 649-661. This included subjecting Diane to public and private badgering, threats, back-biting, undermining and maligning, and a campaign to orchestrate the termination of Diane's employment. ROA.639, 649-661. Baca-Bennett:

- Monitored Gerald's public speech and carped about it publicly (ROA.651, 702-703);

- Threatened Gerald he had "forgotten who Diane works for" to try and silence him (ROA.650);

- Demanded Diane "get her husband under control" and shut him up (ROA.646-647);

- Called Diane off the bench and into chambers to confront Diane with how upset a post about Munford made Baca-Bennett, wrongfully attributing it to Gerald (ROA.646-47);

- Reminded Diane "who she works for" (after Diane said Baca-Bennett needed to speak directly to Gerald) (ROA.646-47);

- Contributed content from Baca-Bennett's own Facebook page to a

criminally operated web site defaming Diane and Gerald (the site was shared in Facebook forums where Tarrant County family lawyers were members) (ROA.650-651, 784);

- Made public Facebook posts complaining about Gerald's election speech, calling him out as the husband of "Associate Judge Diane Haddock" (ROA.651, 703);

- Publicly posted on Facebook that "Diane's" district judge (Bill Harris) agreed Gerald's political ads are "deceitful" (ROA.651, 703);

- Perpetuated a rumor on Facebook Diane had "resigned without notice," leaving her post up even days after the original source had clarified it was false (ROA.655-656, 754-761);

- Made unofficial efforts to have Diane fired, public enough for non-judge, non-lawyer employees to be well aware of them (ROA.659);

- Publicly harangued a lawyer from the bench for representing Gerald, called Gerald "insane or delusional," accused Gerald of trying to "hide" PAC money, called Gerald "an evil man" and "a bully" (ROA.657-658, 786-791);

- Asked the same lawyer from the bench (with others present) "why Judge Haddock [Diane] would not resign" (ROA.657-658, 786-791);

- Also from the bench (with others present), claiming she hoped Gerald and/or Diane would sue her "so her kids could attend Nolan High School" (an Arlington private school) (ROA.657-658, 786-791).

Baca-Bennett was retaliating against Diane for *Gerald's* public speech and political activity, not Diane's. ROA.639-640. *Diane endorsed no candidate, made no speech, had never even met the blogger and did not know him* (ROA.646 [including nn.9-

10] 660).

Tarrant County's written policies claim its employees are not required to participate in public speech or political affiliation and are protected from discipline or termination for refusing. ROA.674-75, 801. Diane reported Baca-Bennett's retaliation and hostile work environment to Tarrant County – her employer – first orally, then in writing. ROA.657, 659, 678-79. Tarrant County took no action to protect Diane – its employee. ROA.678-79. Diane hired a lawyer, who sent Tarrant County a letter detailing Baca-Bennett's pattern of retaliation and harassment. ROA.659, 679-81.

On October 3, 2018, Diane sued Baca-Bennett and Tarrant County under **42 U.S.C §1983**, alleging *Diane's* hostile work environment was in retaliation for speech on matters of public concern attributed to *Gerald*, for Diane's not silencing him, for Diane's refusal to endorse Munford, or some combination of the above. ROA.644. Diane alleged three separate and distinct First Amendment violations: 1) intrusion upon Diane's right to an intimate association/marriage with Gerald (ROA.664-66); 2) retaliation against free speech on a matter of public concern (ROA.663); and 3) retaliation for Diane's refusal to support Munford's candidacy (political patronage). ROA.663-64.

In Tarrant County's family courts, only a majority of seven family District Judges can fire an associate judge. ROA.673. Before Diane filed her lawsuit, Baca-

Bennett had attempted unsuccessfully to marshal enough votes to fire her. ROA.653. Baca-Bennett claimed on Facebook there was a "pact" among the majority to give each district judge their choice of associate judge, rather than voting independently on merit. ROA.658, 792-96. Also prior to Diane's lawsuit, Defendant Ken Newell won his primary election for District Judge of the 233rd (Diane's primary court) and had no opponent in the fall general election. ROA.658. Newell visited Diane and acknowledged he was aware of Baca-Bennett's campaign to get Diane fired. ROA.658-59. Newell acknowledged Diane was the most qualified candidate for 233rd Associate Judge. ROA.659. Newell informed Diane, "I want to be clear – I have not made a decision about what to do with you," or words to that effect. ROA.659.

By October 11, 2018, Tarrant County and Baca-Bennett were both served with Diane's First Amendment lawsuit. ROA.640. Within days (and without Diane's knowledge), Tarrant County and the District Judges removed Diane's name from early drafts of the Tarrant County 2019 jury calendar. ROA.662. Less than 90 days after Diane's lawsuit was served, on January 4, 2019 – the same day Newell was sworn in – Defendants Newell, Nevarez, Wells and Hennigan voted to fire Diane at the exact same time, on the exact same day. ROA.661-62, 802. On January 7, 2019, Newell presented Diane with the Order terminating her "effective immediately." ROA.661-62, 802. Diane was then replaced with a less qualified candidate – the

same person who (just hours before the four judges terminated Diane) had emceed Newell's investiture ceremony – an event which likely took several weeks to plan (likely placing the decision to fire her right on the heels of her lawsuit). ROA.662.

After being fired within 90 days of serving her lawsuit, Diane amended her Complaint, to add the other six (6) family district judges[4] and to allege her termination was an additional adverse employment decision. ROA.661-63. In addition to maintaining her hostile work environment claims, Diane pled several alternative theories regarding her termination:

1) the four District Judges fired Diane for the same reasons Baca-Bennett had previously subjected her to the hostile work environment (Diane's marriage to Gerald, Gerald's speech, and not supporting Munford or silencing Gerald) (ROA.682);

2) Baca-Bennett's retaliatory motives were imputed to the judges firing Diane, because Baca-Bennett committed acts of a retaliatory nature she intended would cause (and did cause) Diane to suffer an adverse employment action (ROA.640, 661-61, 682);[5]

3) the four District Judges fired Diane in retaliation for having filed her First Amendment lawsuit – itself an independent First Amendment violation (ROA.682);

---

[4] The District Judges who signed Diane's Order of Termination were sued in their official capacities for the termination itself, while the remaining District Judges are necessary parties to Diane's equitable claim for reinstatement or front pay in lieu thereof (if Diane prevails, under Texas law all seven Tarrant County Family Court District Judges must sign Diane's Order of Reinstatement).

[5] Sometimes called the "cat's paw" theory; ***Staub v. Proctor Hospital*, 562 U.S. 411 (2011)**; ***Gee v. Principi*, 289 F.3d 342, 346-347 (5th Cir.2002)**; **Fifth Circuit Pattern Jury Instructions (Civil Case), §11.7 (2014)**.

4) Newell's "undecided" ended when Diane filed her lawsuit, Newell wanted Diane fired in retaliation for filing it, and Newell's retaliatory motives were imputed to the other judges firing Diane, because Newell's vote was an act of a retaliatory nature he intended would cause (and did cause) Diane to suffer an adverse employment action (ROA.640, 661-61, 682);[6]

5) Tarrant County shared Baca-Bennett's retaliatory animus (over the marriage, speech and lack of patronage) or Newell's retaliatory animus over the lawsuit (in which Tarrant County was sued), and it either conspired with the District Judges to fire Diane or refused to enforce its written policy protecting her from such retaliation; alternatively, the District Judges were de facto policymakers for Tarrant County on the administration of its employment policies regarding associate judges (ROA.666-67 [including n.20], 670-686).

Diane sought reinstatement, or front pay in lieu, from the District Judges in their official capacities, as well as compensatory damages from Tarrant County and Baca-Bennett in her individual capacity. ROA.639-43, 686-87.

Tarrant County filed a Rule 12(b)(6) Motion to Dismiss, contending Diane was a "confidential employee" and "policymaker" and therefore subject to a "patronage dismissal" as a matter of law, and further contending Diane had failed to allege a policy or custom giving rise to municipal liability under 42 U.S.C. §1983. ROA.809-44. The District Judges filed a Rule 12(b)(6) Motion to Dismiss joining in Tarrant County's argument that Diane was subject to a "patronage dismissal," and also asserting Baca-Bennett was entitled to qualified immunity on Diane's hostile

---

[6] Also the "cat's paw" theory.

work environment claim. ROA.848-73. The district court found Baca-Bennett was entitled to qualified immunity (ROA.995-97, RE Tab 4.), Diane was subject to a "patronage dismissal," (ROA.968-74, RE Tab 4) and Tarrant County had no liability. ROA.974-81, RE Tab 4, ROA.983, RE Tab 3. Diane appeals from that Order and Final Judgment. ROA.959-982, RE Tab 4, ROA.983, RE Tab 3. The district court dismissed the entire lawsuit on that basis, without addressing Diane's association/intimate relationship, freedom to petition or free speech claims. ROA.959-82, RE Tab 4, ROA.983, RE Tab 3. Diane appeals from that Order and Final Judgment. ROA.959-2, RE Tab 4, ROA.983, RE Tab 3.

## STANDARD OF REVIEW

This Court reviews a district court's dismissal under Rule 12(b)(6) *de novo*.[7] To survive a motion to dismiss, a complaint must contain sufficient factual matter which, when taken as true, states "a claim to relief that is plausible on its face."[8] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[9] A complaint "does not need detailed factual allegations," but the facts

---

[7] *Cicalese v. UTMB*, **924 F.3d 762, 765-66 (5ᵗʰ Cir. 2019)**.
[8] *Cicalese*, **924 F.3d**, **at 765**. (citing *Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Ga., Inc.*, **892 F.3d 719, 726 (5ᵗʰ Cir. 2018)** (quoting *Bell Atl. Corp. v. Twombly*, **550 U.S. 544, 570 (2007)**).
[9] *Id.; Ashcroft v. Iqbal*, **556 U.S. 662, 678 (2009)**.

alleged "must be enough to raise a right to relief above the speculative level."[10]

Rule 12(b)(6) dismissals are disfavored and rarely granted, because the standard for dismissal is very high.[11] A court must "accept the complaint's well-pleaded facts as true and view them in the light most favorable to the plaintiff."[12] Rule 8(a)(2) merely requires a short and plain statement of the claim showing the pleader is entitled to relief.[13] A district court errs when it holds a plaintiff to a heightened pleading standard.[14]

## SUMMARY OF THE ARGUMENT

In this 42 U.S.C. §1983 action, Diane – an associate judge – alleged her government employers' actions (a hostile work environment, then termination) violated four distinct First Amendment rights: 1) freedom of intimate association/marriage; 2) freedom of petition; 3) free of speech; and 4) freedom from coerced political patronage in public employment. Because these are core First Amendment rights, all government infringement is subject to strict scrutiny. Rather than treating these as separate claims and allowing the facts to develop, the district court erred by conflating these rights into one claim (patronage), applying a one-

---

[10] *Twombly*, **550 U.S., at 555** (citing 5 WRIGHT & MILLER, FED. PRAC. & PROC.§ 1216, 235–36 (3d ed. 2004)).

[11] *Lormand v. U.S. Unwired, Inc.*, **565 F.3d 228, 232 (5ᵗʰ Cir. 2009)**.

[12] *Cox v. Kaelin*, **577 Fed.Appx. 306, 310 (5ᵗʰ Cir. 2014)**.

[13] **Fed. R. Civ. P. 8(a)(2)**.

[14] *Cicalese* **924 F.3d, at 76**.

size-fits-all balancing test incorrectly, then dismissing the case in its entirety – all at the 12(b)(6) stage. This Court should reverse.

Government employers violate the First Amendment right of intimate association when they retaliate against employees for their spouses' lawful conduct. Marriage – our nation's oldest and most sacred intimate relationship – deserves the utmost constitutional protection from government intrusion. Because marriage is so deeply private and its intimate details *cannot* be matters of public concern, several circuits expressly reject applying a ***Pickering/Connick*** balancing test (normally reserved for speech claims) to weigh the employee's and employer's interests, while other circuits nominally apply ***Pickering/Connick*** but heavily favor and uphold the intimate marriage right.

Even when a ***Pickering/Connick*** balancing test is applied to marriage, our society has recognized for decades that judges and spouses share equal dignity and cannot be treated as mere extensions of one other. The First Amendment not only protects the public speech and political activity of judges' *spouses*, existing codes of judicial conduct adequately address any government interests, and no government interest justifies placing higher burdens on judges or their spouses than applicable judicial codes already do. Because the ***Pickering/Connick*** balancing test so heavily favors marriage, Diane's hostile work environment and termination for her husband's perceived election and issue speech violated her First Amendment right

to intimate association/marriage.

On Diane's freedom of petition claim, lawsuits by employees against government employers often deliver significant oversight benefits to the sovereign public. Governments must not misuse their employer roles to prevent or punish this important deliberative process. Courts examine whether the context, content, and public interest demonstrate that the employee – in suing – spoke on a matter of public concern as a citizen and not merely as an employee. If so, the lawsuit itself is protected First Amendment activity, so courts then apply the ***Pickering/Connick*** balancing test to see if the employee's core right to petition is outweighed by the government employer's interest in efficiency of operations. Diane's lawsuit sought to assert, clarify and develop important First Amendment rights, and several news articles demonstrated a high level of public interest. Defendants offered no efficiency argument, their "confidential employee" and "policymaker" arguments fail. The ***Pickering/Connick*** balancing test favors Diane's lawsuit as protected activity, and terminating her for filing it violated her First Amendment right to petition.

On Diane's speech claim, the election and issue speech Diane's employers punished was not her speech, but even if it had been, it was protected by the First Amendment. Under ***Pickering/Connick***, courts first confirm the speaker spoke as a citizen – not as an employee – on a matter of public concern, as determined by

content, form, context, time, place and manner. The government must then demonstrate that its interest in efficiency of operations outweighs the speaker's right to speak and the public's right to hear, and that restricting or punishing the speech is the least restrictive means.

The blogs Diane's government employers found repugnant were written by a non-employee Diane did not even know. They occurred outside the office and not during work hours, and they had no effect Diane's performance or the quality of her work. Defendants asserted no efficiency argument to Diane's speech claims but contended she was a "confidential employee" and a "policymaker." These arguments fail ***Pickering/Connick***, because election or issue speech and the public's right to hear it – both so fundamental to our democracy – may have the highest degree of protection. Further, marriage, speech and lawsuits of public concern are not rationally related to an employee's ability to keep court confidences or implement policy. Still further, the least restrictive means of achieving those ends is to terminate employees who fail at them – not punishing marriage, speech or lawsuits. Retaliating against the latter is the officials' interest, not a government interest. Diane's hostile work environment and termination because of election or issue speech violated the First Amendment.

On her patronage claim, Diane neither publicly supported nor opposed any political candidate, but she was perceived as opposing judicial candidate Jim

Munford or refusing to support him. A hostile work environment and termination resulted. In First Amendment cases alleging coerced political patronage in public employment, courts apply the ***Elrod/Branti*** balancing test to the employee's position, to determine whether forced political patronage is the least restrictive means of achieving a vital government interest. Defendants' "confidential employee" and "policymaker" labels fail, because in Tarrant County's family courts seven associate judges each serve all seven district judges – forty-nine independently developing working relationships. Close confidences common where all court personnel serve the same judge do not arise in this context.

There are also no "policies" to be implemented – merely a few judge preferences. These preferences are well known by lawyers regularly practicing in the courts – not just associate judges. It is irrational to insist that "only persons supporting Jim Munford for judge" can keep confidences or follow directions and implement policy, and again, the least restrictive means of keeping court confidences and implementing policy is to fire associate judges who fail – not require them to support Jim Munford. Finally, the Third Circuit has recently held that judges are *not* policymakers for ***Elrod/Branti*** purposes, because they do not make policy. Rather, they independently apply law to fact. Diane's hostile work environment and termination violated her right to be free from a forced political patronage in her job.

In a §1983 case against a municipality, the plaintiff must show the

municipality's policy or custom (written or established by pattern), or a single decision by municipality's policymaker, violated her constitutional rights. When Tarrant County began the family court associate judge program, it established a cooperative, co-employer relationship with the District Judges, in which the District Judges now share power, influence and control over Diane's working conditions and work environment, for which Tarrant County compensates them and provides financial resources, building facilities, technology, equipment and courthouse security. The District Judges are therefore *de facto* policymakers for Tarrant County on the work environment of associate judges.

Tarrant County violated its express, written policy protecting all employees from political coercion by officials and those "who deal directly with the county." Diane repeatedly advised Tarrant County her First Amendment rights were being violated, Tarrant County was consciously indifferent. When Diane served Tarrant County's with her lawsuit, its policymakers – the District Judges and Tarrant County District Clerk – immediately removed Diane from the 2019 trial calendar, and she was fired within 90 days. Tarrant County is liable for violating Diane's constitutional rights, and the district court erred in dismissing it.

Finally, Baca-Bennett was not entitled to qualified immunity for subjecting Diane to hostile work environment, because Baca-Bennett had fair warning in 2018 that Diane's First Amendment rights were clearly established. The Supreme Court

recognized First Amendment protection for public employee speech in 1968, freedom against political patronage in 1976, and freedom of intimate association in 1984. The district court's conclusion that the Texas associate judge's position must first be litigated in this Circuit contradicts authority from the Supreme Court and this Circuit.

For all these reasons, this Court should reverse and remand.

## ARGUMENT AND AUTHORITIES

As of March 2012, federal, state and local governments employed 22 million Americans,[15] paying them roughly $87.9 billion.[16] That $87.9 billion is a powerful tool public employers can weaponize to silence or punish speech on matters of public concern by public employees or their families – eliminating important voices in government oversight and our democracy, and denying the public information it has a right to hear.

Against this backdrop, watchwords like "freedom of association," "freedom of petition," "freedom of speech," "strict scrutiny" and "least restrictive means of achieving a vital government interest" cease to be abstract law school buzzwords. Rather, these monumental principles of democracy assume their proper place as

---

[15] *2012 Census of Governments: Employment Census Report*; Government Division Briefs, United States Census Bureau, U.S. Department of Commerce, by Lisa Jessie and Mary Tarleton, released March 6, 2014.
[16] *Id.*

monolithic bulwarks – bought in blood – defending the very life of our republic. They guard against the rule of tyranny and protect the voices of 22 million people (and their families) against removal from public discourse and the electoral process.

*I.(A) Did the district court err when it dismissed Diane's freedom of association/intimate relations claim – that as a public employee, Diane could not be retaliated against for her husband Gerald's public speech on a matter of public concern – without recognizing and addressing it as a separate and distinct violation of the First Amendment?*

Taking Diane's factual allegations as true, Diane's government employers did not punish her for her *own* speech (via hostile work environment or termination), because Diane made no speech. ROA.646 [including nn.9-10]; 660. Rather, *they punished Diane because she was married to Gerald* – the person to whom they attributed the speech they abhorred. ROA.639-640.[17]

As noted in 1987 by then Chief Judge of the Seventh Circuit and well-known American jurist Richard Posner:

> "To retaliate against a man by hurting a member of his family is an ancient method of revenge, and is not unknown in the field of labor relations."[18]

As this Circuit has recognized, the First Amendment protects two broad

---

[17]On her termination, Diane does not have to prove the District Judges had a retaliatory motive toward her marriage to Gerald. She can also prevail by showing their decision was influenced or resulted from Baca-Bennett's retaliatory motive. *See Gee v. Principi*, **289 F.3**d, at 346-347 (**5th Cir.2002**); *Staub v. Proctor Hospital*, **562 U.S. 411** (**2011**); **Fifth Circuit Pattern Jury Instructions (Civil Case), §11.7 (2014)** (sometimes called the "cat's paw" theory).

[18]*N.L.R.B. v. Advertisers Mfg. Co.*, **823 F.2d 1086, 1088** (**7th Cir. 1987**).

categories of association or relationship.[19] The first protects "choices to enter into and maintain certain intimate human relationships."[20] Those intimate human relationships include marriage, the begetting and bearing of children, child rearing and education, and cohabitation with relatives.[21] The second category is association for the purposes of engaging in other activities protected by the First Amendment, such as speech or the free exercise of religion.[22]

This Circuit has upheld First Amendment protection for expressive relationships for public employees in the union context.[23] The elements of a claim are: 1) adverse employment action; 2) the employee's interest in "associating" outweighs the employer's interest in efficiency;[24] and 3) the protected activity was a substantial or motivating factor.[25] Regarding intimate relationships, this Circuit has held a school principal's work relationships do not involve "deep attachments and commitments" warranting constitutional protection;[26] nor are typical college basketball coach-player relationships sufficiently private or intimate enough to warrant constitutional protection.[27] But can there be any relationship more private

---

[19]*Caleb v. Grier*, <u>598 Fed.Appx. 227, 237</u> (5th Cir. 2015) (citing *Roberts v. United States Jaycees,* 468 U.S. 609, 617 (1984)).
[20]*Grier*, 598 Fed.Appx., at 237. (citing *United States Jaycees,* 468 U.S., at 617).
[21]*Id*. (citing *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte,* 481 U.S. 537, 545 (1987)).
[22]*Id*. (citing *United States Jaycees,* 468 U.S., at 618).
[23]*Hitt v. Connell*, <u>301 F.3d 240</u> (5th Cir.).
[24]The *Pickering/Connick* balancing test
[25]*Hitt*, <u>301 F.3</u>d, at 246.
[26]*Grier, 598 Fed.Appx., at 237*.
[27]*Wallace v. Texas Tech*, 80 F3d. 1042, 1051 (5th Cir. 1996).

or intimate than marriage?

**1) <u>Marriage is Our Society's Oldest and Most Sacred Relationship:</u>**

The Supreme Court has long regarded marriage as a deeply intimate and private matter:

> "We deal with a right of privacy older than the Bill of Rights – older than our political parties…"[28]

As the Court later wrote in 1984:

> "The Court has long recognized that, because the Bill of Rights is designed to secure individual liberty, *it must afford the formation and preservation of certain kinds of highly personal relationships a substantial measure of sanctuary from unjustified interference by the State*…[W]e have noted that certain kinds of personal bonds have played a critical role in the culture…; they thereby foster diversity and act as critical buffers between the individual and the power of the State...***Protecting these relationships [including marriage] from unwarranted state interference therefore safeguards the ability independently to define one's identity that is central to any concept of liberty***." (Cleaned up; Emphasis added).[29]

**2) <u>Other Circuits Uphold First Amendment Strict Scrutiny Protection of the Intimate Marriage Relationship and Either Reject the *Pickering/Connick* Balancing Test or Apply It in Favor of the Marriage Interest:</u>**

At least three circuits have held that when a public employee suffered retaliation because of a *spouse's* conduct or personality (not because of what the employee did) the First Amendment right to intimate association is violated. In ***Adler***

---

[28]***Griswold v. Connecticut*, <u>381 U.S. 479, 486</u> (1965)**.
[29]***United States Jaycees*, 468 U.S., at 618-19**.

***v. Pataki***,[30] a lawyer served as deputy counsel for litigation at a state agency. His wife – also a lawyer – had filed a wrongful termination lawsuit against the attorney general's office.[31] The court presiding over *Mrs. Adler's* case awarded her sanctions against the state, and about a week later, the state fired *Mr. Adler* from *his* job.[32]

As the Second Circuit concluded in ***Adler***, when a government employer retaliates against one spouse for conduct of the *other* spouse, the First Amendment is violated:

> If the First Amendment accords an individual some right to maintain an intimate marital relationship free of undue state interference, *Adler's claim properly invokes the protection of that Amendment. His claim is grounded on the most intimate of relationships, marriage, and <u>warrants an appropriately high degree of protection</u>*….For purposes of this case, we need only rule that the activity of Adler's wife in suing state officials for herself and another plaintiff because of employment discrimination in her department *could not reasonably be found to justify his discharge*. Wherever the line might be drawn that separates a state's permissible and impermissible actions against an employee based on a spouse's conduct, *Adler's discharge because of his wife's lawsuit is well across the line.* **A relationship as important as marriage cannot be penalized for something <u>as insubstantial as a public employer's discomfort</u> about a discrimination lawsuit brought by an employee's spouse.** (Cleaned up; Emphasis added).[33]

The ***Adler*** court then held that – unlike free speech cases[34] – no ***Pickering/Connick*** analysis applies:

---

[30]**185 F.3d 35** (**2**nd **Cir. 1999**).

[31]***Adler*, 185 F.3**d, **at 39**.

[32]***Id***.

[33] ***Adler*, 185 F.3**d, **at 44**.

[34] As discussed *infra* at section I(C) (p. 29ff.), the Supreme Court has developed what is often called the ***Pickering/Connick*** balancing test for public employee free speech cases. *See **Pickering***

[E]ven if a ***Pickering***-type balance is appropriate…it would take a very strong showing…to tip the balance in the employer's favor. There is nothing in the record to suggest that the lawsuit brought by Adler's wife threatened the proper functioning of [Adler's employer] to a degree sufficient to permit his discharge.[35] (Cleaned up).

***Adler***, **185 F.3**d, at **45**.[36]

In ***Adkins v. Board of Educ. of Magoffin County, Ky.***,[37] Diral Adkins was a school principal, and the plaintiff (his wife Margie) was his secretary.[38] Diral refused to provide false "documentation" supporting a superintendent's (Whitaker's) plan to fire five teachers.[39] Whitaker told Diral Margie would probably not be rehired.[40] To Margie, Whitaker said "I have no problem at all with your work….I can't get rid of Diral, and you're the next best thing."[41] Whitaker claimed he fired Margie because he "could not get a handle on the situation in the high school" because Margie "was

---

***v. Board of Ed.***, **391 U.S. 563** (1968); ***Connick v. Myers***, **461 U.S. 138** (1983). As this section I(A) demonstrates, this Circuit should reject applying the ***Pickering/Connick*** balancing test in intimate association cases.

[35] The court reached this conclusion *despite* the fact it had already decided Adler's job was a "policy-making position," and *despite* his employer's claim Ms. Adler had made statements during her lawsuit ["you know my husband"] triggering its perception Mr. Adler could not be trusted with confidential information – *the very claims Defendants made about Diane below because of Gerald's speech*.

[36] *See also*, ***Sutton v. Village of Valley Stream, N.Y.***, **96 F.Supp.2d 189, 193** (E.D.N.Y. 2000) (applying ***Adler, supra***, father-son relationship was equally protected by First Amendment; where son alleged he suffered hostile work environment because of father's political activity, if "'simple vindictiveness' [for father's politics] was defendants' true motive [against son], the First Amendment will have been violated").

[37] **982 F.2d 952** (6th Cir. 1993).

[38] ***Adkins***, **982 F.2**d, at **953**.

[39] ***Id.***

[40] ***Id***.

[41] ***Adkins***, **982 F.2**d, at **954**.

more loyal to the principal [Diral] than she was to her job."[42] The Sixth Circuit held these facts stated a claim for First Amendment retaliation based on the intimate relationship of marriage.[43] It reversed the trial court's dismissal and remanded without ever mentioning *Pickering/Connick* or any other balancing test.[44]

The Eleventh Circuit has expressly found intimate relationships *so* private and intimate they *cannot* be matters of "public concern" or subject to *Pickering/Connick* balancing:

> This right to freedom of association extends to public employees being able to engage in associative activity without retaliation….We conclude…[the *Pickering/Connick* balancing test] is inapplicable to freedom of association claims…We do not view *Connick* as a retreat from *NAACP v. Alabama,* **357 U.S. 449, 460–61, 78 S.Ct. 1163, 1171, 2 L.Ed.2d 1488 (1958),** in which Justice Harlan wrote for the Court: "*it is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters ... state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny.*" Indeed, even a public employee's association choices as to whom to *date* enjoy constitutional protection. (Cleaned up; Emphasis added).

*Hatcher v. Board of Public Educ. and Orphanage for Bibb County*, <u>**809 F.2d 1546, 1557-58**</u> **(11ᵗʰ Cir. 1987)**; *see also* ***D'Angelo v. Sch. Bd. of Polk Cty., Fla.*, 497 F.3d 1203, 1212 (11th Cir. 2007)** ("We have long held that, unlike speech or petitions by public employees, associational activity by public employees need not be on matters

---

[42]*Id.*
[43]*Adkins*, <u>**982 F.2**</u>d, **at 956** (citing *United States Jaycees* and *Rotary Club of Duarte, supra*)
[44]*Id.*

of public concern to be protected under the First Amendment."); ***Bouldin v. Troy***, **2016 WL 11674943** **(M.D. Ala. 2016)** ("In the Eleventh Circuit, 'public concern' is not part of the analysis of a freedom of association claim, regardless of whether that claim is an expressive association claim or an intimate association claim").

A federal district court in Georgia wrote that an employee's "right to sustain the marital relationship is at the core of the intimate association right implicit in the First Amendment," and it is "not the sort of relationship a government employer should impede based on certain supervisors' dislike of the employee's spouse. *The employee's interest is weighty*."[45] (Emphasis added). In contrast, "an employer's purely subjective fear of disruption is insufficient to outweigh an employee's exercise of her rights."[46] Thus, the sabotage of a 20-year employee's career because her supervisor had a low opinion of her husband violated the First Amendment.[47]

At least one court in the Ninth Circuit has also dispensed with the necessity of any ***Pickering/Connick*** balancing test in intimate association claims. In ***Gray v. Bruneau-Grand View School District No. 365***,[48] Tammy Gray alleged she was put on probation and subjected to excessive observations and evaluations in retaliation for her husband's objection to a school district policy.[49] The court described this as

---

[45]***Tucker v. Georgia DPS***, **2009 WL 2135807** **(S. D. Ga. 2009), p. 12**.
[46]***Tucker***, **at p. 13**.
[47]***Id***.
[48]**2007 WL 1381785** **(D. Idaho 2007)**.
[49]***Gray***, **at p. 1**.

a "pure association claim," and held:

> **Because Gray's claim is a free association claim, the familiar** ***Connick*** **balancing test…does not apply here…**[B]*ecause* Connick's *public concern test grew out of a speech case, it may not appropriately recognize the important distinction between speech and association, [which] may lead … to insufficient protection of the associational rights of public employees…***This is particularly true as to purely private matters such as the choice of whom to marry…Clearly, Gray's association with her husband is a purely private matter. (Cleaned up).** (Emphasis added).[50]

Thus, "[e]ven if the Court *were* to apply some form of the ***Connick*** balancing test, it would conclude that the Defendant's interests here cannot outweigh the Plaintiff's right of intimate association with her husband."[51] (Emphasis added).

There are exceptions. For example, the First Amendment did not protect a police officer's job when his wife said in a secret audio recording that she could "set up" and get the police chief fired by offering him a bribe.[52] A correctional officer could be terminated for living with a brother on probation for failure to pay child support.[53] When both spouses worked for the same employer, nepotism or other concerns applied.[54] In ***Shahar v. Bowers***,[55] the Georgia OAG contended after an

---

[50]***Id.***

[51]***Gray*, n. 2**.

[52]*Singleton v. Cecil,* **133 F.3d 631, 635 (8th Cir.1998)**.

[53]*Ross v. Clayton County,* **173 F.3d 1305, 1310–11 (11th Cir.1999)**.

[54]*See, e.g., **McCabe v. Sherrett**,* <u>12 F.3d 1558, 1562</u> (11th Cir. 1994) (police chief disfavored secretary married to police officer); ***Parks v. City of Warner Robins, Ga.*,** <u>43 F.3d 609, 614-616</u> **(11th Cir. 1995)** (upholding anti-nepotism ordinance); **Montgomery v. Carr,** <u>101 F.3d 1117</u> **(6th Cir. 1996)** (anti-nepotism policy upheld).

[55]<u>**114 F.3d 1097, 1105-06**</u> **(11th Cir. 1995)**.

attorney's publicized "Jewish, lesbian-feminist, out-door wedding" she could not "make good judgments for the Department" or enforce Georgia's sodomy statute.[56]

Where a public employee's spouse has not engaged in unlawful conduct, no nepotism rules apply, and the spouse is merely exercising his or her own protected First Amendment rights, this Circuit should join the circuits above and dispense with the ***Pickering/Connick*** balancing test in intimate association cases. Intimate relationships cannot be a matter of public concern, and no government interest can outweigh marriage – the oldest and most sacred relationship in our nation's history.

### 3) Even if *Pickering/Connick* Does Apply, It Heavily Favors Diane; Modern Society Recognizes Judges and Their Spouses are Different People:

State courts, commissions on judicial ethics, and the American Bar Association have long recognized judges and their spouses are not and cannot be treated as mere extensions of each other. In 1976, the New Jersey Supreme Court upheld First Amendment protection for public speech and political activity by judges' spouses:

> It goes without saying that our system of government is predicated upon the premise that *every citizen shall have the right to engage in political activity. It is a basic freedom enshrined in the First Amendment.*[57]
>
> …

---

[56] ***Shahar*** would hardly hold up under the Supreme Court's decisions in ***Lawrence v. Texas*, 539 U.S. 558 (2003)** (striking same-sex criminal statutes) and ***Obergefell v. Hodges*, --- U.S.---, 135 S.Ct. 2584 (2015)** (expanding constitutionally protected right of marriage to same-sex couples).
[57]*Application of Gaulkin*, **351 A.2d. 740, 743 (New Jersey 1976)**.

[T]he *autonomy of the judge's spouse should simply be accepted as an understood premise of modern life.*[58](Cleaned up).

As offensive and unconstitutional as it was to restrict a judge's wife from her own speech and political life in 1976, it is no less offensive in 2020 for Defendants to claim they can punish an associate judge *for her husband's* speech and political life. As an Illinois judicial advisory committee opinion explained:

> *It is not reasonable for anyone to assume that married individuals share the same political views.* While marriage is many things, it is not a merger of the political thoughts and beliefs of the individuals joined in marriage. To the contrary, marriage "is an association that promotes a way of life, not causes; a harmony of living, not political faiths; a bilateral loyalty, not commercial or social projects."[59]

As long as judges are not active election candidates themselves, their spouses *are not prohibited* from actively engaging in political activity – even publicly endorsing a candidate for public office, and soliciting funds campaign contributions for that candidate.[60] In the same vein, the American Bar Association's *Model Code of Judicial Conduct* has *never* prohibited a judge's spouse from engaging in independent political activity.[61]

Like the ABA's *Model Code*, the only prohibitions Texas' Code of Judicial Conduct places on judges' family members' activities relate to: 1) minimizing

---

[58]*Gaulkin*, **351A.2d., at 746.**
[59]*Illinois Advisory Opinion 06-2, Illinois Judges' Association 2006*. (quoting *Griswold*, **381 U.S., at 486**).
[60]*Id*.
[61]**Key Issues in Judicial Ethics:** *Political Activity by Members of a Judge's Family*, **American Judicature Society 1996, by Cynthia Gray, Director, Center for Judicial Ethics, p. 1**.

investments to diminish the judge's disqualifications;[62] and 2) accepting certain loans and/or gifts.[63] In Canon 5 ("Refraining from Inappropriate Political Activity"), the judges' spouses, families and members of their households are not even mentioned.[64] Thus, the State of Texas Commission on Judicial Conduct has already established that any existing vital government interests (including the interests Defendants advanced below – ensuring associate judges keep court "confidences" and implement "policy")[65] can be accomplished without punishing an associate judge (who is fulfilling her Oath of Office) for her spouse's independent political activity or public speech on a matter of public concern.

Surely by the year 2020 the time has come to recognize that judges and their spouses have independent thoughts, political positions and opinions on matters of public concern. Diane's allegations that her government employers punished her for Gerald's lawful conduct (via hostile work environment or termination) is a pure association claim protected by the First Amendment, and this Circuit should reject applying the ***Pickering/Connick*** balancing test to it. Alternatively, for the reasons above and those argued below[66], the Court should weigh ***Pickering/Connick*** in Diane's favor, and reverse and remand her pure association claim for discovery and

---

[62] **Texas Code of Judicial Conduct, Canon 4 (D)(3)**.
[63] **Texas Code of Judicial Conduct, Canon 4 (D)(4)**.
[64] **Texas Code of Judicial Conduct, Canon 5**.
[65] If truthful, nothing more than a subjective fear like that discussed in ***Tucker***, ***supra***.
[66] *See* section I(C), *infra* at p. 29.

trial.

*I.(B) Did the district court err when it dismissed Diane's freedom of petition claim – never challenged by any 12(b)(6) Motion or discussed in the district court's Order –without analyzing it as a separate cause of action and considering whether Diane, in filing her lawsuit, spoke as a citizen on a matter of public concern?*

Taking Diane's allegations as true, Diane pled in the alternative that within a few days of her serving this lawsuit against Baca-Bennett and Tarrant County to assert her previously violated First Amendment rights, the District Judges and Tarrant County removed Diane from the draft 2019 trial calendar, and within 90 days they fired her. ROA.640, 661-662, 685-686. These facts and those detailed in the Statement of Facts above[67] form "a chronology of events from which retaliation may plausibly be inferred."[68] On this claim, Diane alleges her termination was retaliation for suing Tarrant County and Baca-Bennett.[69]

1) **The First Amendment Protects Lawsuits Against Government Employers, Because Such Lawsuits Develop Important Legal Rights and Serve the Public Interest:**

In ***Borough of Duryea v. Guarnieri,***[70] the Supreme Court recognized that

---

[67]Pp. 5-12, *supra.*

[68]***Bosque v. Starr Cty.,*** 630 Fed. App'x 300, 305 **(5th Cir. 2015);** *Mooney v. Lafayette County School Dist.***,** 528 Fed.App'x. 447, 456-57 **(5th Cir. 2013).**

[69]On her termination, Diane does not have to prove the District Judges had a retaliatory motive toward her lawsuit against Tarrant County or Baca-Bennett. She can also prevail by showing their decision was influenced or resulted the retaliatory motive of someone else (i.e., Baca-Bennett, Newell, Tarrant County, etc.). *See Gee v. Principi*, 289 F.3d, at 346-347 **(5th Cir.2002);** ***Staub v. Proctor Hospital,*** 562 U.S. 411 **(2011); Fifth Circuit Pattern Jury Instructions (Civil Case), §11.7 (2014)** (sometimes called the "cat's paw" theory).

[70]564 U.S. 379 **(2011).**

"[a]mong other rights essential to freedom, the First Amendment protects 'the right of the people'…to petition the Government for a redress of grievances."[71] Some rights and freedoms are so fundamental to liberty "they cannot be bargained away in a contract for public employment."[72] "Our responsibility is to ensure that citizens are not deprived of these fundamental liberties by virtue of working for the government."[73]

As the Supreme Court wrote in *Guarnieri*:

> ***Petitions to the courts and similar bodies can likewise address matters of great public import***…Individuals may also "engag[e] in litigation as a vehicle for effective political expression and association, as well as a means of communicating useful information to the public."…Litigation on matters of public concern may facilitate the informed public participation that is a cornerstone of democratic society. It also allows individuals to pursue desired ends by direct appeal to government officials charged with applying the law. (Emphasis added).[74]

The Court recognized the danger, however, that when public employees ask courts to clarify important rights and address other matters of public concern, government employers are likely to retaliate. The Court strongly cautioned against allowing such retaliation:

> ***The government may not misuse its role as employer unduly to distort this deliberative process***. Public employees are "the member of a community most likely to have informed and definite opinions" about a wide range of matters related, directly or indirectly, to their

---

[71]*Guarnieri,* **564 U.S., at 382 (2011)**.
[72]*Guarnieri,* **564 U.S., at 386**.
[73]*Id.*
[74]*Guarnieri*, **564 U.S., at 397**.

employment…Just as the public has a right to hear the views of public employees, ***the public has a right to the benefit of those employees' participation in petitioning activity. Petitions may "allow the public airing of disputed facts" and "promote the evolution of the law by supporting the development of legal theories,"*** and these and other benefits may not accrue ***if one class of knowledgeable and motivated citizens is prevented from engaging in petitioning activity***. When a public employee seeks to participate, as a citizen, in the process of deliberative democracy, either through speech or petition, "it is necessary to regard the [employee] as the member of the general public he seeks to be." (Emphasis added).[75]

"When a public employee petitions as a citizen on a matter of public concern, the employee's First Amendment interest must be balanced against the countervailing interest of the government in the effective and efficient management of its internal affairs."[76] "If that balance favors the public employee, the employee's First Amendment claim will be sustained."[77] Whether an employee's petition relates to a matter of public concern will depend on "the content, form, and context of [the petition], as revealed by the whole record."[78]

## 2) <u>Diane's Lawsuit Involved Matters of Public Concern and Public Interest:</u>

The content, form, and context of Diane's First Amended Complaint (<u>ROA.203-244</u>) (her live pleading when Defendants fired her) demonstrate her several matters of public concern:

---

[75]***Guarnieri*, 564 U.S., at 397-98.**
[76]***Guarnieri*, 564 U.S., at 398**.
[77]***Id***.
[78] ***Id.***

1) that Texas family court associate judges are protected from retaliation for their spouses' public speech by the First Amendment right of intimate relationships ([ROA.224-25](ROA.224-25));

2) that an elected district judge had threatened to fire an associate judge – either for the purpose of silencing the judge's spouse to influence a public election or to retaliate against the associate judge's spouse by firing his wife ([ROA.206-222](ROA.206-222), [241-243](241-243));

3) that a hostile work environment can constitution retaliation giving rise to a §1983 retaliation claim under **Burlington N[79]** ([ROA.203-244, 237](ROA.203-244));

4) that Tarrant County, Diane's co-employer with the District Judges, had tolerated and supported weaponizing Diane's job in violation of its own written policies, or alternatively that its written policies permitted such retaliation against associate judges, or that the District Judges were county policymakers on matters related to the co-employment enterprise, and that the county was liable under **Monell** (among other claims) ([ROA.230-244](ROA.230-244));

5) that Texas associate judges are not policymakers or confidential employees under Texas' unique Family Code provision where seven associate judges serve seven district judges, and they therefore have the same First Amendment rights against retaliation for speech or patronage (or lack thereof) as other county employees enjoy ([ROA.227-230](ROA.227-230)).

This Circuit considered whether a public employee suing his employer "spoke as a citizen" in **Gibson v. Kilpatrick**:[80]

"[I]dentifying oneself as a public employee does not forfeit one's ability to claim First Amendment protections[81]…[A] citizen who works for the government is nonetheless a citizen."[82]…If "a public employee takes his

---

[79] **[548 U.S. 53](548 U.S. 53)** (2006).
[80] **[838 F.3d 476](838 F.3d 476)** (5th Cir. 2016).
[81] Citing **Lane v. Franks**, **[573 U.S. 228](573 U.S. 228)** (2014).
[82] Citing **Garcetti**, 547 U.S., at 419.

job concerns to persons outside the work place in addition to raising them up the chain of command at his workplace, then those external communications are ordinarily not made as an employee, but as a citizen."[83] By filing suit, this is exactly what Gibson did. Thus, in suing the mayor he spoke as a citizen.[84]

Just like Gibson, in suing Baca-Bennett and Tarrant County Diane spoke as a citizen.

This Circuit also held in ***Gibson*** that speech involves matters of public concern "when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community' or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'"[85] While Gibson's claims missed that mark,[86] Diane's lawsuit hit the bullseye. In addition to asserting and seeking to clarify the important First Amendment rights described above, Diane was asserting *both* Gerald's rights as a speaker *and* the public's right to hear.[87] Diane's lawsuit was also reported in several news outlets, demonstrating her petition was a subject of legitimate news interest – a subject of general interest and of value and concern to the public.[88] Diane's case

---

[83] Citing ***Davis v. McKinney*****, 518 F.3d 304, 313 (5th Cir. 2008).**

[84] ***Gibson*****, 838 F.3d, at 482.**

[85] ***Gibson*****, 838 F.3d, at 483** (citing ***Lane*****, 573 U.S., at 241** (quoting ***Snyder v. Phelps*****, 562 U.S. 443, 453 (2011)**).

[86] ***Gibson*****, 838 F.3d, at 487.**

[87] The Supreme Court has consistently recognized the public's right to receive information as more important even than the speaker's right to speak it. *See* Section I(C), *infra*.

[88] Among others, <u>*Judge versus judge*</u>*: One claims she faced harassment and retaliation and county silent*, Fort Worth Star-Telegram, by Mitch Mitchell, November 2, 2018; <u>*Family Court Feud*</u>*: A battle royale breaks out between family court judges*, Fort Worth Weekly, by Peter Gorman, November 1, 2018; <u>*Fort Worth Judge Sues Fellow Jurist Over Facebook Posts*</u>*: Diane Scott Haddock alleges that she was subjected to "public and private badgering, threats, back-biting, undermining and maligning" because she refused a direct command from Fort Worth's 360th*

also generated multiple posts on a Facebook page devoted to Tarrant County Lawyers (the Tarrant County Lawyers posts and comments made after Diane's lawsuit was filed are not part of this record, but many Facebook posts made prior to the lawsuit are in the record. ROA.258-259, 262-294, 304-307, 309, 310-317, 340, 348-352. For all of these reasons, Diane's lawsuit spoke on a matter of public concern.

The District Judges' 12(b)(6) motion and reply combined for about thirty-five (35) pages. ROA.809-844, 938-949. Tarrant County's 12(b)(6) motion and reply combined for roughly thirty (35) pages of argument. ROA.848-871, 950-958. Nowhere in any of those documents did anyone claim Defendants had the right to fire Diane for filing this lawsuit – Defendants never mentioned Diane's freedom of speech/petition claim that they terminated her for filing the lawsuit. Nor did Defendants advance any *Pickering/Connick* efficiency argument that an associate judge who sues her government employers to clarify her rights cannot do her work. Nor did the district court's twenty-four (24) page Order (Tab 4) ever address Diane's alternative freedom of petition claim before dismissing the case in its entirety.

---

*District Court Judge Patricia Baca-Bennett to prevent her husband from engaging in political activity*, Texas Lawyer, Law.com, by John Council, October 9, 2018; *Tarrant County judge sues colleague over alleged intimidation tactics*, The Texas Monitor, by The Texas Monitor Staff, November 6, 2018.

**3) The Strict Scrutiny-Based *Pickering/Connick* Balancing Test Heavily Favors Protection of Diane's Right to Petition:**

For these reasons and those demonstrated below,[89] the ***Pickering/Connick*** balancing test heavily favors Diane on her freedom of petition claim, and the district court erred in dismissing it. This Court should reverse and remand the petition retaliation claim for discovery and trial.

*I.(C) Assuming the district court could ignore Diane's "pure association" claim and allow her to be punished for Gerald's conduct, did the district court err when it dismissed Diane's free speech claim by applying an <u>Elrod/Branti</u> analysis to Diane's job, rather than applying a <u>Pickering/Connick</u> balancing test to the speech?*

As demonstrated at pp. 5-8 above, for purposes of this appeal, *all* of the protected First Amendment speech activity Diane's government employers sought to punish was speech they attributed to *Gerald – not Diane*.[90] Even if the speech attributed to Gerald were recast and considered to be *Diane's* speech, however, the First Amendment nevertheless protected it, because it was "issue and election" speech. The public had a paramount right to hear it, and Diane would have had the right to speak it had she chosen to.

---

[89] *See* Section I.(C).

[90] The facts show some of the speech attributed to Gerald was actually made by groups he merely associated with and others he was believed to associate with. Gerald's own First Amendment freedom of expressive association provides yet another layer of protection to the election speech attributed to Gerald. *See* **United States Jaycees**, **supra**, and ***Rotary Club***, **supra**. Since Gerald is not the plaintiff, however, this Brief does not perform that analysis.

1) **Free Speech Protects Both the Speaker's Right to Speak and the Public's Right to Hear:**

The First Amendment's prohibition against the government's abridging citizens' free speech not only protects the right of the <u>speaker</u> *to speak*, it also protects the right of his <u>potential audience</u> *to <u>receive</u> the communication*. In a 1976 case called ***Virginia State Bd. of Pharmacy***,[91] the Supreme Court surveyed many contexts in which it has held this was true. While "[f]reedom of speech presupposes a willing speaker,"[92] where a speaker exists, the protection afforded is *to the communication* – to its source and its recipients *both*.[93] First Amendment protection *necessarily* includes and protects the right to "receive information and ideas"[94] in numerous contexts. In ***Virginia State Bd. of Pharmacy***, the Supreme Court held pharmaceutical advertisers had standing to assert the First Amendment's protection of the public's interest in receiving drug price information.[95] The Court has held non-inmate mail recipients have a superior right against mail censorship to that of inmates themselves,[96] and a broadcaster's TV audience has the right to hear a response from someone the station previously attacked personally.[97]

---

[91] ***Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.***, <u>425 U.S. 748</u> **(1976)**.
[92] ***Virginia State Bd. of Pharmacy,* 425 U.S., at 756**.
[93] ***Virginia State Bd. of Pharmacy,* 425 U.S., at 756-57**.
[94] ***Kleindienst v. Mandel***, <u>408 U.S. 753, 762-763</u> **(1972)**.
[95] ***Virginia State Bd. of Pharmacy,* 425 U.S., at 756-57**.
[96] ***Procunier v. Martinez***, **416 U.S. 396, 408-409 (1974)**.
[97] ***Red Lion Broadcasting Co. v. FCC***, **395 U.S. 367, 390 (1969)**.

## 2) **The First Amendment Has Its Fullest and Most Urgent Application to Election/Issue Speech:**

During elections, the Supreme Court has long recognized the public's right to know as superior to the speaker's right to speak:

> In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation. "[I]t can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office."
>
> …
>
> The First Amendment protects political association as well as political expression. The constitutional right of association…stemmed from the Court's recognition that "(e)ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association."[98]

Speech about the qualifications and history of political candidates for political office must be protected against "[t]he ongoing chill upon [election and issue] speech that is beyond all doubt protected:" [99]

> Speech is an essential mechanism of democracy, for it is the means to hold officials accountable to the people[100]…The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it. ***The First Amendment "has its <u>fullest and most urgent</u> application to speech <u>uttered during a campaign for political</u>***

---

[98] ***Buckley v. Valeo***, **424 U.S. 1 (1976)** ***(per curiam)*** *(Although **Buckley** was superseded by statute as stated in **McConnell v. Federal Election Com'n**, <u>**540 U.S. 93**</u> (2003), **McConnell** was itself overruled in **Citizens United**, infra, which cites **Buckley** favorably and relies upon it.*

[99] ***Citizens United*** **v. Federal Election Com'n**, <u>**558 U.S. 310, 336**</u> **(2010)**.

[100] ***Citizens United***, **558 U.S., at 339** (citing ***Buckley***, **424 U.S., at 14-15**).

_**office**_."[101]

…

For these reasons, ***political speech must prevail against laws that would suppress it, whether by design or inadvertence***. Laws that burden political speech are "subject to strict scrutiny," which requires the Government to prove that the restriction "furthers a compelling interest and is narrowly tailored to achieve that interest."[102]

The First Amendment is premised on mistrust of governmental power.[103] It stands against attempts to disfavor certain subjects or viewpoints.[104] Content-based restrictions are prohibited.[105] Prohibited, too, are restrictions distinguishing among different speakers – allowing speech by some but not others.[106] "As instruments to censor, these categories are interrelated: Speech restrictions based on the identity of the speaker are all too often simply a means to control content."[107] The Government may commit a constitutional wrong by identifying certain preferred speakers – denying others the right to use speech to strive to establish worth, standing, and respect for the speaker's voice.[108] "The Government may not by these means deprive the public of the right and privilege to determine for itself what speech and speakers

---

[101] *Id.* (citing *Eu v. San Francisco County Democratic Central Comm.,* **489 U.S. 214, 223 (1989)**).

[102] *Citizens United*, **558 U.S., at 340** (citing *Federal Election Com'n v. WRTL,* **551 U.S. 449, 464 (2007)**).

[103] *Id*.

[104] *Id*.

[105] *Id.* (citing *United States v. Playboy Entertainment Group, Inc.,* **529 U.S. 803, 813 (2000)**).

[106] *Id*. (citing *First Nat. Bank of Boston v. Bellotti,* **435 U.S. 765, 784 (1978)**).

[107] *Id*.

[108] *Citizens United*, **558 U.S., at 340-41**.

are worthy of consideration. The First Amendment protects speech and speaker, and the ideas that flow from each."[109]

### 3) Courts Achieve Strict Scrutiny of Speech Restrictions By Applying the *Pickering/Connick* Balancing Test:

For cases where government employers seek to restrict or punish the free speech of public employees, the Supreme Court articulated a balancing test in *Pickering v. Board of Education*.[110] According to *Pickering*, the idea that teachers relinquish their First Amendment rights to comment on matters of public interest regarding their employer "*proceeds on a premise that has been unequivocally rejected in numerous prior decisions of this [Supreme] Court.*"[111] The *Pickering* test balances the public employee's interest – as a citizen – in commenting on matters of public concern, with the government employer's interest in promoting the efficiency of its services.[112] Because of "[t]he public interest in having free and unhindered debate on matters of public importance – the core value of the Free Speech Clause of the First Amendment," the Supreme Court held Mr. Pickering's interest in writing a letter to the newspaper about a proposed tax increase – even one including allegedly false statements about how his superiors had handled money from past tax increases – outweighed his employer's interest in silencing him, when his statements

---

[109] *Id.*
[110] *Pickering v. Board of Ed.*, **391 U.S. 563** (1968).
[111] *Pickering*, **391 U.S., at 568**.
[112] *Id.*

were "neither shown nor can be presumed to have in any way impeded [his] proper performance of his daily duties…or to have interfered with the regular operation of the schools generally."[113]

In ***Connick v. Myers***,[114] an assistant district attorney (Myers) was informed she would be transferred.[115] Myers strongly opposed her transfer, and in an effort to stave it off, she prepared a questionnaire soliciting the views of her fellow staff members on office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, among other issues.[116] She met with the district attorney (Connick), who urged her to consider the transfer. Myers said she would.[117] When Connick left, Myers distributed the questionnaire to 15 other assistant district attorneys. Connick discovered it, terminated her, and Myers sued claiming her termination violated her right to free speech.[118]

The ***Connick*** court held that whether speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record.[119] The Court found most of Myers' questions (*e.g.*, the confidence and degree of trust her coworkers placed in various supervisors, the

---

[113] ***Pickering***, 391 U.S., at 572-73.
[114] ***Connick v. Myers***, <u>461 U.S. 138</u> (1983).
[115] ***Connick***, 461 U.S., at 140.
[116] ***Connick***, 461 U.S., at 140-41.
[117] ***Connick***, 461 U.S., at 141.
[118] ***Id.***
[119] ***Connick***, 461 U.S., at 147-48.

level of office morale, or the need for a grievance committee) did not fall "under the rubric of matters of 'public concern.'"[120] They were mere extensions of Myers' personal dispute over her transfer – not questions of public import in evaluating Connick as an elected official:

> Myers did not seek to inform the public that the District Attorney's office was not discharging its government responsibilities…Nor did Myers seek to bring to light actual or potential wrongdoing or breach of public trust on the part of Connick or others.[121]

The Court did find that one of Myers' questions arguably addressed a matter of public concern (whether co-workers felt pressure to work on political campaigns).[122] "We have recently noted that official pressure upon employees to work for political candidates not of the worker's own choice constitutes a coercion of belief in violation of fundamental constitutional rights."[123] The Court further noted the "demonstrated interest in this country that government service should depend upon meritorious performance rather than political service."[124] However, "[a]lso relevant is the manner, time, and place in which the questionnaire was distributed:"[125]

> Here the questionnaire was prepared, and distributed at the office; the manner of distribution required not only Myers to leave her work but for others to do the same in order that the questionnaire be

---

[120] *Connick,* **461 U.S., at 148.**
[121] *Id.*
[122] *Connick*, **461 U.S., at 149**.
[123] *Id.* (citing *Branti* and *Elrod*, *infra*).
[124] *Id*. (citing *CSC v. Letter Carriers*, **413 U.S. 548** (**1973**)).
[125] *Connick*, **461 U.S., at 152**.

completed…[T]he fact that Myers, unlike Pickering, exercised her rights at the office supports Connick's fears that the functioning of his office was endangered.[126]

Thus, Myers' survey and actions together were most accurately characterized as an employee grievance concerning internal office policy, so Myers spoke as an employee – not a citizen – and her termination did not violate the constitution.[127]

### 4) **The *Pickering/Connick* Balancing Test Heavily Favors the Election/Issue Speech Involved in This Case, Diane's Marriage, and Her Lawsuit:**

Applying the ***Pickering/Connick*** balancing test to Diane's Complaint, we must first consider the speech attributed to Gerald. Just as Mr. Pickering wrote a letter to the newspaper, the groups Baca-Bennett associated with Gerald posted blogs on the internet. These blogs brought to light and informed the electorate of wrongdoing affecting a judicial candidate's suitability for public office.[128] Even Tarrant County conceded below that political speech is a matter of public concern. ROA.825. Second, considering content, form, context, manner, time and place, the blogs about Munford were *citizen* speech, *not employee* speech. Like Pickering, the bloggers spoke publicly and outside the office. Like Pickering, there was *no* evidence Diane's daily performance was impacted by them. ROA.645. Diane's daily performance was *only* interrupted by Baca-Bennett's complaint about them.

---

[126] ***Connick,*** **461 U.S., at 153**.
[127] ***Connick***, **461 U.S., at 154**.
[128] *See* p. 6, *supra.*

.

Finally, the blogs were election speech, which is of paramount importance and should be given the utmost weight. As noted in *Citizens United*, speech holding officials accountable to the public "is an essential mechanism of democracy," and "[t]he right of citizens to hear and use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it."[129] The First Amendment "has its fullest and most urgent application to speech uttered during a campaign for political office."[130] Given the Supreme Court's pronounced warnings about restrictions on election speech, it is difficult to imagine any circumstance in which the Court would require greater weight and magnitude to be given a citizen's speech than here. Under *Citizens United*, strict scrutiny applies.[131]

On Diane's association, petition and speech claims, the *Pickering/Connick* balancing test easily favors Diane. Defendants were required to show that punishing Diane[132] (for exercising her core First Amendment rights of intimate association, petition and speech on a matter of public concern) was the least restrictive means of achieving efficiency in their operations. Defendants offered no such "efficiency" explanation. Even if they had, *Defendants* would have had the burden of proof to

---

[129] *Citizens United*, 558 U.S., at 339.
[130] *Id*.
[131] *Citizens United*, 461 U.S., at 340.
[132] By termination or hostile work environment

show that the efficiency of their operations *was in fact the real reason*, and not retaliation.[133] On Diane's pled facts, as in ***Sutton***, ***supra***, the *real reason* was simple vindictiveness against Diane's First Amendment rights. Defendants' 12(b)(6) motions should have been denied.

While Defendants did claim Diane was a "confidential employee," "policymaker," and subject to a "patronage dismissal," they (and the district court) never applied these justifications Diane's intimate association, petition or speech claims. If applied, these arguments fail the ***Pickering/Connick*** balancing test. Taking Diane's allegations as true, "confidential employee" fails as a purely factual matter, because no court confidences exist. ROA.668-70. In the Tarrant County family courts, seven different associate judges serve seven different district judges. ROA.671-74. This means a total of forty-nine (49) separate, distinct and independent working relationships between associate and district judges are in various states of development. ROA.671-74. Close confidences that might be common where court personnel all serve a single judge do not arise in this context. ROA.671-74. Likewise, Diane's pleading establishes there are no "policies" – only a few individual judge preferences that are just as widely known among lawyers regularly practicing in the Tarrant County family courts. ROA.667-70. For 12(b)(6) purposes,

---

[133] *See Sutton,* **96 F.Supp.2d, at 193** "if 'simple vindictiveness' was defendants' true motive, the First Amendment will have been violated."

the purported "confidential employee" and "policymaker" government interests are factually untrue.

Even assuming court confidences or "policies" *could* arise (and be a legitimate government interest), Defendants below articulated no link between their "need" to infringe on Diane's First Amendment rights and Diane's ability to keep court information confidential or be able to follow directions sufficiently to implement these unarticulated "policies."[134] There is no rational basis for believing that because an employee has married someone the government does not "approve of," filed a lawsuit seeking to clarify important rights, or spoken as a citizen on a matter of public concern, she is suddenly unable to follow directions, especially if that employee has served in her job for twenty (20) years without a single mark on her record. ROA.645.

Finally, Defendants' "confidential employee" and "policymaker" arguments must give way to Diane's First Amendment rights of association, petition and speech under ***Pickering/Connick***, because infringing on such rights is not the least restrictive means of achieving those interests. As the Supreme Court noted in ***Rutan v. Republican Party of Illinois***,[135] "*a government's interest in securing effective*

---

[134] *See **Tucker, supra**, "the employee's interest is weighty," and "an employer's purely subjective fear of disruption is insufficient to outweigh an employee's exercise of her rights." **Tucker, at p. 12-13**.*
[135] **497 U.S. 62** **(1990)**.

*employees can be met by discharging, demoting, or transferring staff members whose work is deficient.*" In the same way, Defendants' purported interests in keeping court information confidential, or ensuring "policy" are best implemented, are best served by terminating those employees who actually fail at keeping confidences or implementing policy – not by terminating high-performing employees for marital, speech or political reasons. These latter terminations serve the officials' personal interests, not the government's interests.

Taking Diane's allegations as true, she was terminated *either* for simple vindictiveness *or* a purely subjective fear because of her intimate association with Gerald ("*a right of privacy older than the Bill of Rights – older than our political parties*"),[136] because she filed this lawsuit petitioning her government (a right so fundamental to liberty it "*cannot be bargained away in a contract for public employment*"),[137] or election speech attributed to Gerald ("beyond all doubt protected"),[138] or some combination of the above. The district court erred by failing to apply the ***Pickering/Connick*** balancing test separately to these claims and instead dismissing them. Because the ***Pickering/Connick*** balancing test on association, petition and speech heavily favors Diane, this Court should reverse their dismissal and remand for discovery and trial.

---

[136] ***Griswold***, **381 U.S., at 486**.
[137] ***Guarnieri***, **564 U.S., at 386**.
[138] ***Citizens United***, **558 U.S., at 336**.

*I.(D) Even if an Elrod/Branti analysis applied to Diane's political patronage claim, did the district court err in holding associate judges are "confidential employees" and "policymakers," and that both the associate judges <u>and their spouses</u> are subject to a political loyalty requirement, in conflict with recent Third Circuit authority? Is that the same thing as "compelled speech," which the Supreme Court recently said the First Amendment prohibits?*

As demonstrated above, in dismissing all of Diane's First Amendment retaliation claims, the district court erred by failing to consider and separately analyze: 1) Diane's right to an intimate relationship with Gerald (without suffering a hostile work environment or being fired for speech attributed to him); 2) Gerald's independent right to associate with the group who blogged it; 3) whether a ***Pickering/Connick*** analysis should apply to the speech or the association(s) and how; and 4) Diane's right to file this lawsuit to assert and clarify all of the above. Instead, the district court conflated these claims with Diane's First Amendment political patronage claim, then improperly applied the ***Elrod/Branti*** balancing test to all of them instead of only the patronage claim. This alone requires reversal and remand for the consideration of those claims. Unfortunately, the district court compounded its error by applying the ***Elrod/Branti*** test incorrectly and also dismissing Diane's patronage claim.

**1) <u>In Political Patronage Cases Courts Exact Strict Scrutiny Using the *Elrod/Branti* Balancing Test:</u>**

The first two Supreme Court cases recognizing substantial First Amendment limitations on government employers' authority to require or prohibit political

patronage by public employees were ***Elrod*** and ***Branti***.[139] Although both cases arose

factually out of political party affiliation,[140] it is important to understand all three

decisions had their deeper origins in free speech, compelled speech, coerced belief,

and preserving the public electorate's right to hear a voice it might otherwise never

have known about. As the Supreme Court said in ***Elrod***:

> The cost of the practice of patronage is the restraint it places on freedoms of belief and association…[141] An individual who is a member of the out-party maintains affiliations with his own party at the risk of losing his job. He works for the election of his party's candidates and espouses its policies at the same risk. [This is] ***tantamount to coerced belief.*** [citing ***Buckley***, ***supra***, (an electoral *free speech* case)]***[142]…[T]he individual's ability to act according to his <u>own</u> beliefs is constrained…***[143]
>
> It is not only belief and association which are restricted where political patronage is the practice. ***The free functioning of the electoral process also suffers***….[144] These protections reflect our "profound national commitment to the principle that debate on public issue should be uninhibited, robust, and wide-open."[145] (Cleaned up; Emphasis added).

Further, ***Branti*** made clear that both it and ***Elrod*** were simply extending to nearly

every public employee the same First Amendment speech protections the Supreme

Court had long since recognized decades earlier for other citizens:

> For ***if the government could deny a benefit to a person because of his***

---

[139] ***Elrod v. Burns***, <u>427 U.S. 347</u> **(1976)** (Democrats fired non-Democrats); ***Branti v. Finkel***, <u>445 U.S. 507</u> **(1980)** (Democrats fired Republicans).
[140] See previous footnote.
[141] ***Elrod***, **427 U.S., at 355**.
[142] ***Id.***
[143] ***Elrod***, **427 U.S., at 355-56**.
[144] ***Id***.
[145] ***Elrod***, **427 U.S., at 357**.

> *consitutionally protected speech or associations*, his exercise of those freedoms would in effect be penalized and inhibited. ***This would allow the government to produce a result which it could not command directly…***[146]
>
> …
>
> If the First Amendment protects a public employee from discharge based on what he has said, it must also protect him from discharge based on what he believes.[147]

Significant impairment of First Amendment rights must survive exacting scrutiny.[148] Encroachment cannot be justified upon the mere showing of a legitimate state interest.[149] Rather, the interest must be permanent – one of vital importance – and the burden is on the government to show it exists.[150] "[C]are must be taken not to confuse the interests of partisan organizations with governmental interests. Only the latter will suffice."[151] Finally, the employer's claimed government interest must outweigh the employee's "incurred loss of protected rights,"[152] and the government must show it had "no less drastic" a way of satisfying its interest.[153]

2) <u>The *Elrod/Branti* **Balancing Test Favors Diane, Because Forced Patronage is the Same as "Compelled Speech, Because Close Confidences Do Not Arise in Forty-Nine (49) Working Relationships, and Because There Are No "Policies":**</u>

---

[146] ***Branti***, **445 U.S., at 515** (citing ***Perry v. Sinderman***, <u>**408 U.S. 593**</u> **(1972)** and ***Speiser v. Randall***, <u>**357 U.S. 513**</u> **(1958)**.

[147] ***Id***.

[148] ***Elrod***, **427 U.S., at 362**.

[149] ***Id***.

[150] ***Id***.

[151] ***Id***.

[152] ***Id***.

[153] ***Elrod***, **427 U.S., at 363**.

Diane's "incurred loss of protected rights" – that is, the loss of her right not to be compelled by the government during an election what to say, what not to say, or who to support or stop – is substantial and "beyond all doubt protected.".[154] And it is not merely the government's *restraint* the Supreme Court has warned against – Supreme Court has recently and strongly emphasized the First Amendment violations created when the government employers *compel* employee speech or support for an idea or principle:

> "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or *force citizens to confess by word or act their faith therein*."[155]
>
> …
>
> Compelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command.[156]

Thus, a government employer cannot require its employees to give (or not to give) their money to an organization who will use it for speech.[157] Diane's interest in not being compelled to support Munford carries the same great weight.

Against Diane's "beyond all doubt protected" interest, Defendants' purported interests (that Diane was "policymaker" and a "confidential employee") must fall,

---

[154] *Citizens United*, **558 U.S., at 336**.
[155] *Janus v. American Federation of State, County, and Municipal Employees, Council 31, et al.*, **--- U.S.----, 138 S.Ct. 2448, 2463 (2018)** (emphasis added in *Janus*).
[156] *Id.*
[157] *Janus,* **138 S.Ct., at 2486**.

for the same reasons it fell under ***Pickering/Connick***, *supra*.[158] First, Defendants' argument that "only people who supported Munford" can implement policy or keep court confidences is itself irrational. More importantly, the Texas Code of Judicial Conduct – which applies to Diane, not Gerald – actually *prohibits* judges from publicly endorsing a candidate for political office.[159] Significantly, the Code does *not* preclude judges' *spouses* from supporting or opposing political candidates.[160] Thus, Defendants' purported "confidential employee" and "policymaker" interests are reduced to the argument that the least restrictive means of ensuring court confidences are kept and "policies" implemented is: 1) *requiring Diane* to do something *the Code prohibits* her from doing; while 2) *restraining Gerald* from doing something *the Code and other laws allow* him to do. This bizarre outcome is neither rationally related to court confidences or implementation of policy, nor is it the least restrictive means to either.

### 3) The Third Circuit Recently Held Judges Do Not Make Policy; Judges Independently Apply Law to Fact:

The district court's holding that associate judges are "policymakers" also

---

[158] *See* p. 38ff., *supra*.

[159] **Texas Code of Judicial Conduct, Canon 2B** ("A judge shall not lend the prestige of judicial office to advance the private interests of the judge or others…"); **Canon 5(3)** ("A judge…shall not authorize the public use of his or her name endorsing another candidate for any public office…"); *see also* **Texas Judicial Ethics Opinion 170**.

[160] **Texas Judicial Ethics Opinion 170** ("The Code does not attempt to regulate the conduct of a judge's spouse, so this conduct [by the spouse] would not be prohibited.").

conflicts with recent Third Circuit authority. In ***Adams v. Governor of Delaware***,[161] the Third Circuit held that judges are not "policymakers" under ***Elrod***, ***Branti***, and ***Rutan***. In ***Adams***, a lawyer seeking a judicial appointment from Delaware's governor challenged a Delaware Constitution provision limiting service on state court benches to Democrats and Republicans. As an Independent, Adams contended the provision violated his First Amendment right of association and was unconstitutional.[162] Delaware's governor countered (as Defendants did below) that judges were "policymakers," and consideration of political party membership was permissible.[163] At summary judgment, the ***Adams*** district court granted summary judgment for ***Adams*** – ruling the narrow "policymaking" exception in ***Elrod*** and ***Branti*** *does not apply to judges because judges apply, rather than create, law.*[164]

In affirming, the Third Circuit wrote:

> ***We now conclude that <u>a judicial officer, whether appointed or elected, is not a policymaker</u>***…This outcome is clear from the principles animating ***Elrod*** and ***Branti***. The purpose of the policymaking exception is to ensure that elected officials may put in place loyal employees who will not undercut or obstruct the new administration. If a job "cannot properly be conditioned upon allegiance to the political party in control," the policymaking exception is inappropriate. Judges simply do not fit this description. The American Bar Association's Model Code of Judicial Conduct instructs judges to promote "independence" and "impartiality," not loyalty. It also asks judges to refrain from political or campaign activity. The Delaware Code of

---

[161] <u>922 F.3d 166, 181</u> (**3ʳᵈ Cir.**) (*cert. granted* <u>140 S.Ct. 602</u> (**2019**)).

[162] ***Adams***, <u>922 F.3</u>d, at 169.

[163] ***Id.***

[164] ***Adams***, <u>922 F.3</u>d, at 173.

Judicial Conduct similarly makes clear that judges must be "unswayed by partisan interests" and avoid partisan political activity. The Delaware Supreme Court has stated that Delaware judges "must take the law as they find it, and their personal predilections as to what the law should be have no place in efforts to override properly stated legislative will." ***Independence, not political allegiance, is required of Delaware judges***. (Cleaned up; Emphasis added).[165]

In further rejecting the "policymaker" label for judges, the Third Circuit said:

The Governor argues that by interpreting statutes, sentencing criminal defendants, and crafting the common law, judges in Delaware make policy and exercise significant discretion. **But the question before us is not whether judges make policy,** *it is whether they make policies that necessarily reflect the political will and partisan goals of the party in power*….***To the extent that Delaware judges create policy, they do so by deciding individual cases and controversies before them, not by creating partisan agendas that reflect the interests of the parties to which they belong***.

…

The policymaking inquiry is designed to test whether the position in question is one which cannot be performed effectively except by someone who shares the political beliefs of [the appointing authority]. Put simply, while judges clearly play a significant role in Delaware, that does not make the judicial position a political role tied to the will of the Governor and his political preferences. ***As such, the policymaking exception does not apply to members of the judicial branch***. (Emphasis added, citations, quotations and footnotes omitted).[166]

Diane made these same arguments, and the district court erred in rejecting them.

Chief Justice John G. Roberts also warned recently against the dangers of

---

[165] *Adams*, **922 F.3d, at 178-179**.
[166] *Adams*, **922 F.3d, at 179-180**.

politicizing the judiciary:

> "We do not have Obama judges or Trump judges, Bush judges or Clinton judges. What we have is an extraordinary group of dedicated judges doing their level best to do equal right to those appearing before them. That independent judiciary is something we should all be thankful for."[167]

Like every other judge, Diane swore an oath to:

> "…faithfully execute the duties of the office of Associate Judge of the State of Texas…and…preserve, protect, and defend the Constitution and laws of the United States and of this State, so help me God."

ROA.667; RE, Tab 5. Judicial independence – for all judges – necessarily means *not* being required to implement anyone else's political agenda.

The district court erred in holding Diane was a "confidential employee" or a "policymaker" and subject to a political patronage dismissal. This Court should reverse and remand the patronage claim for discovery and trial.

*II. Given Tarrant County's refusal to enforce its own written policies, its conscious indifference to and the participation of its policymakers in the violation of Diane's First Amendment rights, did the district court err when it dismissed Tarrant County on a Rule 12(b)(6) Motion?*

"*Every person who*…subjects, or causes to be subjected, any citizen of the United States...to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit

---

[167] Chief Justice Roberts Makes Rare Criticism of Trump after "Obama Judge" Remark, Laura Stampler, November 21, 2018; http://fortune.com/2018/11/21/chief-justice-roberts-criticize-trump-obama-judge/

in equity, or other proper proceeding for redress…" **42 U.S.C §1983**. In ***Monell v. Dep't of Soc. Servs. of City of N.Y.***,[168] the Supreme Court held a local government can be a "person" subject to liability under §1983.[169] While a municipality is not *automatically* vicariously liable under §1983 for tortious conduct by its employees, a plaintiff *may* properly bring a §1983 claim against a county by alleging her injury resulted from the county's custom or policy, or a single action by a county policymaker.[170]

### 1) Municipal Liability Requires Either Custom/Policy or Single Action By a Policymaker:

To recover from a municipality under §1983, a plaintiff must: "(1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law." ***James v. Tex. Collin Cty.*, 535 F.3d 365, 373** (5th Cir. 2008). As this Court has previously explained, "official policy" may take one of two forms: 1) a plaintiff may point to a policy statement formally announced by an official policymaker; or 2) a plaintiff may prove an unofficial custom or policy through *either* a) a pattern of unconstitutional conduct by municipal actors or employees, *or* b) a final policymaker for the municipality took a single unconstitutional action.[171]

---

[168] **436 U.S. 658 (1978)**.
[169] ***Monell,*** **436 U.S., at 690**.
[170] ***Monell,*** **436 U.S., at 694-95**; ***Hinojosa v. Butler,*** **547 F.3d 285, 296** (5th **Cir. 2008**).
[171] ***Zarnow v. City of Wichita Falls, Tex.,*** **614 F.3d 161, 169** (5th **Cir. 2010**).

As this Circuit has clarified, identifying a final policymaker's decision is *not* a third element – rather, it is an *alternative* to proving policy or custom.[172] Regarding causation, the Supreme Court has held:

> "The conclusion that the action taken or directed by the municipality or its authorized decisionmaker *itself* violates federal law *will also determine* that the municipal action *was the moving force behind the injury* of which the plaintiff complains."[173] (Emphasis added).

Finally, this Circuit has also recognized that §1983 plaintiffs may assert a conspiracy claim.[174] A plaintiff need only establish (1) the existence of a conspiracy involving state action and (2) a deprivation of civil rights in furtherance of the conspiracy.[175] A conspiracy under §1983 may be charged as the legal mechanism for imposing liability on each and all of the Defendants, without regard to which Defendants committed which particular act.[176]

### 2) Tarrant County Established a System in Which Its Delegation of Authority Over Tarrant County Employers Makes the District Judges County Policymakers:

In this case, Diane pled and has demonstrated violations of multiple First Amendment rights. To proceed against Tarrant County under **Monell**, Diane needed only to identify *either* a formal policy or custom *or* an action by Tarrant County's

---

[172] ***Zarnow,*** **614 F.3d, at 169**.

[173] ***Bd. of Cty. Comm'rs of Bryan Cty., Olka. v.Brown***, **520 U.S. 397, 405 (1997)**.

[174] *See* ***Mizell v. North Broward Hospital Dist.,*** **427 F.2d 468, 472–73 (5th Cir.1970)**; *see also* ***Owens v. Board of Regents of Texas Southern University***, **953 F.Supp. 781, 791 (S.D.Tex.1996)**.

[175] ***Owens,*** **953 F.Supp., at 791**.

[176] ***Nesmith v. Alford,*** **318 F.2d 110, 126 (5th Cir. 1963)**, *cert. denied,* **375 U.S. 975 (1964)**.

policymakers that caused her rights to be violated. She did both.

Tarrant County established a cooperative, co-employer working relationship with the District Judges, in which Tarrant County and the District Judges share power, influence and control over Diane's working conditions and work environment. ROA.666-67, 671-74. Tarrant County delegates administration and oversight of the associate judges to the District Judges – including Baca-Bennett – for which Tarrant County compensates the District Judges. ROA.666. Tarrant County provides significant financial resources for the District Judges' and employees' benefit, including facilities, technology, equipment and courthouse security. ROA.666. Tarrant County also performs some of the more traditional employer functions, such as Tarrant County employee orientation, Tarrant County employee handbook, Tarrant County E-mail address, paying Diane's salary, providing health and life insurance, and a retirement plan. ROA.666, ROA.687. The District Judges supervise Tarrant County's associate judge employees. ROA.643-44.

When Tarrant County has become dissatisfied with the District Judges' treatment of other Tarrant County employees, Tarrant County has restructured the working relationship to protect its employees. For example, for years Tarrant County had delegated supervisory responsibility over its Domestic Relations Office ("DRO") employees to the family court District Judges. When tumultuous human

relations issues persisted between the District Judges and DRO employees, Tarrant County withdrew supervisory responsibility from the District Judges and used its financial power to restructure the office so that DRO employees now report directly to the Tarrant County Commissioners.[177]

### 3) **Tarrant County Violated Its Own Written Policy Protecting Employees From Political Coercion:**

On the issue of political coercion, Tarrant County has an *express written policy* that *every* county employee is protected from political coercion or retaliation. ROA.674-677, 798-801. Tarrant County's policy is that it will investigate complaints of political coercion or retaliation, and violators will be subject to disciplinary, administrative or legal action. ROA.674-677, 798-801. This includes coercion/retaliation by other county employees, officials "or non-employees who deal directly with the County." ROA.674-677, 798-801.[178]

Diane also alleged (in the alternative) that Tarrant County's unwritten policy or custom is to grant lesser protection to employees suffering political coercion than

---

[177] Diane learned this fact in April of 2019 while continuing to investigate her claims without the benefit of the discovery process. She advised the district court of her ability to amend and plead it. ROA.899.

[178] Diane pled initially that two consecutive paragraphs in the Tarrant County Employee Handbook should first be construed as providing the *same* rights to politically coerced employees as to employees aggrieved by discrimination or harassment under Title VII and Chapter 21 of the Texas Labor Code (ROA.674-677, 801). Tarrant County failed to enforce those rights for Diane. In the event the two paragraphs are not construed together as providing the same rights, Diane pled alternatively as the next paragraph describes.

other types of retaliation. ROA.677-78, 798-801. Further in the alternative, Tarrant County excludes associate judges from First Amendment retaliation protection. ROA.677-78, 798-801. Still further in the alternative, Tarrant County excludes district judges from the category of "official" or "non-employees who deal directly with the county" it will hold responsible, and instead Tarrant County engages in a practice of non-interference and deference to the district judges regarding the constitutional rights of its associate judges. ROA.677-78, 798-801. This delegation and deference makes the district judges *de facto* policymakers for Tarrant County where the constitutional rights of its associate judges are concerned. ROA.677-78, 798-801.

Diane repeatedly reported Baca-Bennett's political retaliation to Tarrant County HR and County Judge Glen Whitley. ROA.678-79, 798-801. Tarrant County's policymakers consciously and deliberately refused to investigate Diane's complaints and enforce its own policy, and it exercised deliberate indifference to Diane's First Amendment rights. ROA.678-81. Alternatively, a majority of the Tarrant County Commissioner's Court shared the retaliatory motives of Baca-Bennett and actively supported the District Judges' decision to terminate Diane, because Diane had sued Tarrant County. ROA.681. Within days of being sued, Tarrant County policymakers were already removing Diane from the 2019 trial calendar. ROA.662.

Alternatively, Tarrant County had financial power in the family courts co-venture with the District Judges, to influence (or to refuse to influence) the District Judges to treat Tarrant County's associate judges in a constitutional manner. To protect the constitutional rights of its associate judges, Tarrant County can:

1) expressly condition use of county facilities, security and other resources on protecting the constitutional rights of associate judges;

2) expressly condition funding of associate judge positions on respecting the constitutional rights of associate judges;

3) withdraw (or threaten to withdraw) statutory authority for each associate judge to serve all seven (7) district judges, and leave each district court with only one associate judge, unless the associate judges' constitutional rights were respected;

4) when district judges violate the constitutional rights of associate judges, withdraw supervisory authority and have associate judges report directly to Tarrant County on employment matters;

5) eliminate or threaten to eliminate one or more associate judge positions entirely, increasing the district judges' workload unless associate judges' constitutional rights are protected; or

6) refuse to fund the replacement of any associate judge whose constitutional rights were violated.

The district court erred by failing to engage and address Tarrant County's policies, customs and policymaker decisions. ROA.977-981. Diane alleged Tarrant County's retaliatory animus caused her termination, and the district court erred in dismissing Tarrant County. This Court should reverse and remand for discovery and trial.

*III. Did the district court err in holding Defendant Baca-Bennett had qualified immunity, even though the parameters of Diane's First Amendment rights had been clearly established (some longer than 35 years), and despite the fact that Baca-Bennett is an elected judge who swore to uphold the U.S. Constitution and the laws of the United States?*

Diane sued Baca-Bennett in her individual capacity for a hostile work environment[179] that violated Diane's First Amendment rights to the intimate association of marriage, free speech and freedom from forced political patronage, and for Baca-Bennett's retaliatory campaign Diane alleges (in the alternative) got her fired. Because Diane's rights were clearly established in the 1980's and 1990's, the district court erred in holding Baca-Bennett was entitled to qualified immunity.

### 1) Actions for Damages Against Public Officials Are Necessary to Curtail Abuse of Power That Violates Established Rights:

"When government officials abuse their offices, 'action[s] for damages may offer the only realistic avenue for vindication of constitutional guarantees.'"[180] Courts balance this unfortunate reality against social costs, such as the risk that fear of personal monetary liability or litigation might unduly inhibit officials in the discharge of their duties.[181] The Supreme Court has accommodated these conflicting concerns by offering public officials qualified immunity from civil liability, *but only* where "*their actions could reasonably have been thought consistent with the rights*

---

[179] *See* pp. 6-12, *supra*.
[180] ***Anderson v. Creighton*, 483 U.S. 635, 638 (1987)**.
[181] ***Id***.

*they are alleged to have violated*."[182] Whether an official is personally liable for

unlawful action generally turns on 'objective legal reasonableness,' assessed in light

of the legal rules 'clearly established' at the time of the action.[183]

### 2) **Precedent With Fundamentally Similar Fact Scenarios Is Not Required to Defeat Qualified Immunity:**

The Supreme Court has cautioned against requiring plaintiffs to offer

precedent containing "fundamentally similar" factual scenarios to defeat qualified

immunity defenses.[184] "[O]fficials can still be on notice that their conduct violates

established law even in novel factual circumstances."[185] Only the *contours* of the

*right* must be established.[186] The precedent need not be "factually on all-fours with

the case at bar,"[187] if the official has "fair warning" that her conduct violates a

constitutional right.[188] Here, the district court erred by limiting its inquiry to

patronage dismissals of associate judges and looking no further ("[n]o Fifth Circuit

decision has decided whether a Texas associate judge was subject to a patronage

dismissal"). ROA.966, RE Tab 4. The district court never considered Baca-Bennett's

violations of Diane's freedom of intimate association and speech rights, and that was

error.

---

[182] *Id*. (Emphasis added).
[183] *Anderson*, 483 U.S., at 639.
[184] *United States v. Lanier,* 520 U.S. 259, 270 **(1997)** (reversing the Sixth Circuit on that issue).
[185] *Hope v. Pelzer,* 536 U.S. 730, 741 **(2002)**.
[186] *Anderson*, 483 U.S., at 640.
[187] *Bedingfield ex rel. Bedingfield v. Deen,* 487 Fed.Appx. 219, 231 **(5th Cir. 2012)**.
[188] *Cooper v. Brown*, 844 F.3d 517, 524 **(5th Cir. 2016)**.

### 3) **Diane's Rights Were "Clearly Established" Decades Ago:**

As discussed above, the freedom of intimate association/marriage right was clearly established in **_United States Jaycees, supra_**, in 1984. As early as 1993, courts began denying school superintendents (1993) and state troopers (2009) qualified immunity for violating it.[189] Public employee free speech rights were established even earlier – in **_Pickering, supra_** (1968). This Circuit should therefore hold that a state district judge sworn to uphold the U.S. Constitution, who violates these long-established rights by creating a hostile work environment or getting an associate judge fired, is not entitled to qualified immunity.

Even on the patronage issue, Diane's right against a political patronage requirement was clearly established by the Supreme Court in **_Elrod, supra_** (1976). Elrod gave government employers fair warning: they are prohibited from conditioning public employment on political patronage, _unless_ doing so is essential to and the least restrictive means of achieving a vital government interest. The district court's apparent conclusion that every single government job must first be litigated before _any_ government actor can _ever_ be considered "on notice" of the First Amendment is inconsistent with precedent from the Supreme Court, the Sixth Circuit, and this Circuit.

---

[189] **_Adkins_**, **982 F.2**d, **at 956** (school superintendent); see also **_Tucker_**, **2009 WL 2135807**, **p. 15** (state troopers).

### 4) It is "Too Late in the Day" For Baca-Bennett to Deny Having Fair Warning of the Law:

Perhaps this Court put it best in *Brady v. Fort Bend County*:[190]

*For more than two decades, the Supreme Court has consistently held that "the First Amendment forbids government officials to discharge or threaten to discharge public employees solely for not being supporters of the political party in power, unless party affiliation is an appropriate requirement for the position involved."[191]*

…

*In **Sherbert v. Verner**,[192] the Court observed that "[i]t is too late in the day to doubt that the libert[y] of ... expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." **If it was too late in the day three-and-a-half decades ago to consider the County's argument that the Plaintiffs' First Amendment rights could not have been violated by Molina's failure to rehire them because they had no right or expectation of being rehired, it is certainly too late to consider it now.** (Emphasis added).[193]*

If it was "too late" for this Circuit in 1998, surely it is too late in 2018-20.

The Sixth Circuit also rejected the district court's narrow, position-specific approach in *McCloud v. Testa*:[194]

***Testa is entitled to qualified immunity only if the law is unclear, not the facts.***

…

*We reject the notion that there must be a separate patronage dismissal decision by the Supreme Court or the Sixth Circuit involving a*

---

[190] **145 F.3d 691 (5th Cir. 1998)**.

[191] (citing ***Rutan, Branti*** and ***Elrod***).

[192] **374 U.S. 398 (1963)**.

[193] ***Brady*, 145 F.3d, at 702-03**.

[194] **97 F.3d 1536 (6th Cir. 1996)**.

*particular position before qualified immunity can be denied in such a case....Testa's argument must fail. It simply cannot be true [or else] qualified immunity would be converted into a nearly absolute barrier... because the reported case law classifies new positions very slowly.* (Emphasis added).[195]

The district court erred in upholding Baca-Bennett's qualified immunity defense, and this Court should reverse and remand for discovery and trial.

## CONCLUSION AND PRAYER

This Court should reverse the district court's Order and Final Judgment granting Appellees'/Defendants' Rule 12(b)(6) Motions to Dismiss, and remand this case for discovery and trial.

Respectfully submitted,

*s/ Walter L. Taylor*
**WALTER L. TAYLOR**
State Bar No. 19727030
***Wtaylor@thehartlawfirm.com***
**HART LAW FIRM, PLLC**
6630 Colleyville Blvd, Suite 100
Colleyville, Texas 76034
Tel: (817) 329-7020
Fax: (682) 292-7406

**ATTORNEYS FOR APPELLANT DIANE SCOTT HADDOCK**

---

[195] ***Testa*, 97 F.3d, at 1556**.

## CERTIFICATE OF SERVICE

I hereby certify by my signature above that a true and correct copy of the foregoing document has this day been served via electronic service upon the following on this 21st day of May, 2020:

*s/ Walter L. Taylor*
**WALTER L. TAYLOR**

M. Keith Ogle
*mkogle@tarrantcountytx.gov*
David K. Hudson
*dkhudson@tarrantcountytx.gov*
TARRANT COUNTY CRIMINAL DISTRICT ATTORNEY'S OFFICE

Benjamin S. Walton
ASSISTANT ATTORNEY GENERAL
*Benjamin.Walton@oag.texas.gov*
Natalie D. Thompson
ASSISTANT SOLICITOR GENERAL
*natalie.thompson@oag.texas.gov*
OFFICE OF THE ATTORNEY GENERAL

## CERTIFICATE OF COMPLIANCE

Pursuant to **Fed.R.App.P. 32(g)**, by my signature above I certify the following:

1.   This brief complies with the typeface requirements of **Fed. R. App. P. 32(a)(5)** and the type requirements of **Fed. R. App. P. 32(a)(6)** because:

- this brief has been set in a proportionally spaced typeface using Microsoft Word for Office 365 in Times New Roman with a 14-point font.

2.   This brief complies with the type-volume limitation in **Fed. R. App. P. 32(a)(7)(B)** because:

- this brief contains 15,938 words, as determined by the computer software's word-count function, excluding the parts of the brief exempted by **Fed. R. App. P.  32(f)**.

<u>*s/ Walter L. Taylor*</u>
**WALTER L. TAYLOR**